UNITED STATES of America, Plaintiff-Appellee.

v.

Phillip ONORI and Theodore Bukky, Defendants-Appellants.

No. 75–2577.

United States Court of Appeals, Fifth Circuit.

July 26, 1976.

Rehearing Denied Aug. 23, 1976.

Theodore Klein, Miami, Fla., for Onori.

Peter F. K. Baraban, North Miami, Fla., for Bukky.

Robert W. Rust, U. S. Atty., Peter Koste, Michael P. Sullivan, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.

Before WISDOM *, COLEMAN and GEE, Circuit Judges.

GEE, Circuit Judge:

Phillip Onori appeals his conviction on two counts of possession with intent to distribute two grams of cocaine and the distribution of two grams of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and two counts of the same offenses with respect to one pound of cocaine. He and Theodore Bukky appeal conviction on one count of conspiracy to distribute approximately ten pounds of cocaine.

## I. THE FACTS

Patricia Brown was a confidential informant who had known Bukky for several years. In November 1974, she and Bukky discussed whether he would sell or arrange to sell ten pounds of cocaine to her associates, who were actually federal agents. Although the discussions began on November 22, 1974, no cocaine was transferred at that time. Brown testified, however, that Bukky needed money and was anxious to close the deal. On December 5, 1974, Brown was fitted with an electronic surveillance device by federal drug enforcement agents before she met with Bukky, Onori, and Nicole Stegman (a co-defendant who was acquitted by a judgment notwithstanding verdict) at Bukky's apartment. Tape recordings of the ensuing conversation were played to the jury during the trial.[1] The parties dispute the details of what the tapes actually record, but it is uncontested that the gist of the conversation was an apparent attempt by Bukky, Onori and Brown to arrange a sale of cocaine from Bukky and Onori's contacts to Brown's associates.

Although no agreement was reached at this conversation, the parties agreed to continue negotiations. The deal was finally arranged through a telephone conversation between federal agents and Theodore Brown, a friend of Onori commonly referred to as T-Bo. T-Bo apparently arranged with three cocaine dealers to provide the contraband, and these dealers were

---

\* Judge Wisdom was a member of the panel that heard oral arguments but due to illness did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. § 46(d).

1. Another conversation, between undercover government agents and persons more directly involved in the drug transaction, was recorded and was also played to the jury. This conversation was not as critical, however, to the appellants and will not be discussed further in this opinion.

arrested at the consummation of the transaction. Bukky, Onori and Stegman, who were together in Bukky's apartment at the time, were arrested soon afterwards.

The defendants were tried jointly. They admitted that the taped conversation took place but offered an elaborate explanation that the incriminating remarks were merely the result of their "playing a role." Bukky testified that Patricia Brown, the former wife of a musician in the California-based rock group named Three Dog Night, had previously promised him an audition with the group. When Brown later suggested the sale of cocaine by Bukky, she indicated that this group was the eventual consumer and that the group would appreciate Bukky's help. · Bukky testified that he was afraid that a blunt refusal to cooperate would have cost him his chance for an audition, so he agreed in general with Brown, although he refused to accede to Brown's entreaties to supply her with an ounce "taste" of cocaine.

Onori testified that he became involved when Stegman asked him for advice about this situation. Onori and Bukky allegedly agreed to pretend that they were interested in the transaction only to determine whether Patricia Brown was really a friend of Bukky: i.e., presumably, whether Brown would carry out her promise to get Bukky an audition even if Bukky refused to supply cocaine. The taped conversation therefore was, according to the defendants, a performance in which they, as actors, talked about a drug sale no one actually intended to consummate.

According to the defendants, T-Bo overheard Bukky ask Onori for advice, decided to supply Patricia Brown himself, and proceeded with the transaction contrary to Onori's express instructions. T-Bo and the suppliers, caught red-handed with the cocaine, all pled guilty to various counts of the indictment. The jury chose to disbelieve that the defendants had merely been "playing a role," and the appellants concede that there is sufficient evidence to sustain their convictions. They argue, however, that certain trial errors require reversal.

Bukky also argues that he was entrapped "as a matter of law."

## II. ENTRAPMENT AS A MATTER OF LAW

Bukky argues that the means used by the government to "make" the case against him violated his constitutional rights. He points to the fact that Patricia Brown was paid on a contingent fee basis for each drug transaction that "went down"—i. e., that ended in an arrest. He argues that he was trapped by a device—the gambit about an audition with a rock group—tailored especially for him, and that the government had no reason to focus any investigation on him.

In *Williamson v. United States*, 311 F.2d 441 (5th Cir. 1962), *cert. denied*, 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 724 (1965), we reversed a conviction for possession of illicit liquor because the informer who made the government's case had been promised a specified sum of money for successfully incriminating the indicted defendants. The government contends here that it is not obliged to show special justifications for Patricia Brown's behavior since there was no showing that she was paid on a contingent fee basis. Her testimony shows, however, that she expected to receive compensation *after* a case "went down." This is clearly a way of describing a contingent fee arrangement, and the government's assertion to the contrary is unconvincing.

Even so, the *Williamson* rule does not require that we reverse. *Williamson* has been subsequently limited to require reversal of a conviction only when the specific defendant was picked out for the informer's efforts by a government agent. *See, e. g., United States v. Joseph*, 533 F.2d 282, 285 (5th Cir. 1976); *United States v. Oquendo*, 505 F.2d 1307 (5th Cir. 1975); *United States v. Durham*, 413 F.2d 1003 (5th Cir.), *cert. denied*, 396 U.S. 839, 90 S.Ct. 100, 24 L.Ed.2d 89 (1969); *Henley v. United States*, 406 F.2d 705, 706 (5th Cir. 1969). Although government agents eventually participated in the case, the record does not show that Brown was directed by government agents

to make a case against Bukky. The *Wil-liamson* "entrapment-as-a-matter-of-law" defense, therefore, does not apply.

### III. "OTHER CRIMES" EVIDENCE

■ Bukky objects to testimony of Patricia Brown that he gave her cocaine on numerous occasions and that he sold her a small amount about two years before the transactions from which the instant convictions arose.[2] This objection is apparently based on the ground that such evidence was not within the "intent" exception to the rule of inadmissibility of other-crimes evidence. *See, e. g., United States v. Goodwin,* 492 F.2d 1141, 1152 (5th Cir. 1974). We hold that there was substantial need for this evidence on the government's part, and the probative value of such evidence outweighed the possible prejudice that the jury would be induced to convict Bukky merely for being a "bad man."

■ Since the main defense at trial was that Bukky and Onori were merely "acting a role," the defendants clearly put in issue Bukky's intent. Once intent has been made an issue, the government is entitled to bring in evidence of other crimes showing that the defendant previously had such intent. The evidence objected to was, therefore, properly admitted. *Compare United States v. Adderly,* 529 F.2d 1178, 1181–82 (5th Cir. 1976), *with United States v. Arteaga-Limones,* 529 F.2d 1183, 1198 (5th Cir. 1976).

### IV. PREJUDICIAL COMMENTS BY TRIAL COURT

■ Onori objects to the following colloquy, which occurred during cross-examination of a government agent:

Q: [by Onori's counsel] To your knowledge, prior to the entry of the agents into the apartment where Mr. Onori was, did he have any advance knowledge that agents were coming to arrest him, to your knowledge?

Mr. Koste: I object.

The Court: I will sustain in the objection. She [the agent] doesn't know what he knew and what he didn't know, and I would assume that, quite obviously, *he did not know or he probably wouldn't have been there.*

Mr. Moran: I don't know about that, Judge. I would have to object to that. I don't think that is a fair observation.

The Court: *He would be down to his lawyer's office if he wasn't some place else.* (emphasis added)

Onori moved for a mistrial, and he now contends that the denial of the motion was reversible error on the theory that the comments reflected the court's conclusion that he was guilty as charged. While these comments do not clearly reflect the court's conclusion of guilt,[3] the jury might have understood the trial court as expressing its opinion that Onori was guilty. In view of the great weight that a jury undoubtedly attributes to judicial comments, trial courts should endeavor to avoid comments such as were made in this case.

■ Although we do not approve of the comments made by the trial court, such comments, even if they suggest that the court believes the defendant to be guilty, are not necessarily reversible error. For example, in *United States v. Jackson,* 470 F.2d 684, 688–89 (5th Cir. 1972), *cert. denied,* 412 U.S. 951, 93 S.Ct. 3019, 37 L.Ed.2d

---

2. Onori contends that the other-crimes evidence prejudiced his case. The trial court instructed the jury, however, that in determining whether a particular defendant was a member of a conspiracy, it was not to consider what other members of that conspiracy may have said or done. The court also instructed the jury that it "must consider and determine the guilt or innocence of each defendant based upon his own conduct and from the evidence which applies to him as if he were being tried alone. The guilt or innocence of one defendant should not influence the jury respecting other defendants." These instructions adequately isolate Onori from untoward effects of the evidence admitted against Bukky.

3. The court's comments are, of course, also susceptible of the innocent interpretation that had Onori realized he was about to be arrested, he would have rushed to consult with counsel or otherwise ready himself for the impending unpleasantness, prudent behavior even for an innocent man.

1004 (1973), this court held that there was no reversible error when the trial court said to the jury, "I wish you could find all the defendants guilty, and punish them, and everything else," where the trial judge was not urging the jury to return a guilty verdict but was commenting on the burden that the obligation to sentence represented to the court. The facts in this case do not approach the tenor of those in *Jackson*. Instead, this case is more analogous to *United States v. James*, 510 F.2d 546, 550–51 (5th Cir. 1975), *cert. denied*, 423 U.S. 855, 96 S.Ct. 105, 46 L.Ed.2d 80 (1976). There, in response to an offer of proof by the defendant's counsel, the trial court said, "Do that in the Fifth Circuit. Do it in New Orleans, not here." The appellant argued that the jury could have interpreted those remarks as reflecting the trial court's assumption that there would be a conviction. The totality of the circumstances convinced us, however, not to reverse. We noted that a jury of laymen probably interpreted the comments to mean that an appeal would follow *if* there were a conviction. We also observed that the dialogue occupied but a few seconds of a lengthy trial and that it occurred in a procedural discussion. Finally, we noted that the trial court gave a typical curative instruction during his charge to the jury.

■ Many of the factors found convincing in *James* are present here. The allegedly prejudicial comments occupied but a few seconds of a lengthy trial. The comments were directed to defense counsel rather than to the jury. In its instructions the trial court advised the jury that "[i]f during the trial, the Court has intimated any opinion as to the facts, the jury may entirely disregard such intimation, since the jurors alone are sole and exclusive judge of the facts." We hold that the comments do not amount to reversible error.

■ Onori and Bukky also assert that the trial court in effect instructed the jury that Patricia Brown was a credible witness.

The credibility of witnesses is finally a jury question, of course, and this function is not to be unduly infringed by judicial comment. The credibility of Patricia Brown was a key issue in the trial, and had the trial court actually instructed the jury, explicitly or impliedly, to believe her, there might be grounds for reversal. *See United States v. Martinez*, 496 F.2d 664, 668 (5th Cir.), *cert. denied*, 419 U.S. 1051, 95 S.Ct. 627, 42 L.Ed.2d 646 (1974); *cf. United States v. Fischer*, 531 F.2d 783 (5th Cir. 1976).

■ The court's comments occurred after Onori's counsel asked Brown whether she had ever lied under oath. The court excused the jury and admonished the defense counsel for asking such a question when he had no evidence that Patricia Brown had ever lied under oath. When the jury was recalled, the trial court stated:

Ladies and Gentlemen of the jury, I have sustained the Government's objection to the last question by counsel as to whether or not this lady has ever lied under oath. That is a completely improper question.

Further, I want to instruct you that merely asking a question of that kind is not evidence of any nature that she has ever lied under oath, and you are not permitted to draw any inference or presumption that she did. Does everybody understand that?

We dispense, first of all, with Onori's contention that this instruction demeaned his counsel before the jury. The trial court was well within the bounds of discretion in this attempt to eradicate an inference that the court believed was improperly raised.

■ A slightly more serious contention is that the court's comments may be read as prohibiting the jury from drawing an inference that Patricia Brown *ever* lied under oath, including at the instant trial. But the jury was free, of course, to disbelieve any or all of Patricia Brown's testimony and was so instructed by the court.[4] This instruction mitigates any harm caused by the

4. The court instructed the jury that:
 It is the province of the jury to determine the credibility of each witness and the weight

to be given to his testimony. In weighing the testimony of each witness the jury should consider his relationship to the Government

judge's comments. Moreover, it is clear from the context that the court's remarks constituted nothing more than a reminder to the jury that comments by counsel are not evidence and must not be considered as such. The court did not abuse its discretion in making these remarks, and the attacks upon them are far-fetched to the point of frivolity.

## V. LIMITATIONS ON CROSS–EXAMINATION

■ Onori and Bukky contend that the trial court committed reversible error in limiting the defense's cross-examination into the motivation and bias of two government witnesses. The Sixth Amendment confrontation clause guarantees to a criminal defendant the right to cross-examine a witness against him. *See Pointer v. Texas,* 380 U.S. 400, 404–05, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). This right is especially important with respect to accomplices or other witnesses who may have substantial reason to cooperate with the government. *See, e. g., United States v. Greenberg,* 423 F.2d 1106 (5th Cir. 1970); *Grant v. United States,* 368 F.2d 658, 661 (5th Cir. 1966). Indeed, it is so important that the defendant is allowed to "search" for a deal between the government and the witness, even if there is no hard evidence that such a deal exists. *See Grant v. United States, supra.* What tells, of course, is not the actual existence of a deal but the witness' belief or disbelief that a deal exists. *United States v. Dickens,* 417 F.2d 958, 959 (8th Cir. 1969).

■ Despite the presumption in favor of free cross-examination, placing restrictions on its scope is within the sound discretion of the trial court. *See Alford v. United States,* 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624 (1931); *Gordon v. United States,* 438 F.2d 858, 865 (5th Cir.), *cert. denied,* 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 56 (1971). As we stated in *Jackson v. Beto,* 388 F.2d 409, 411 (5th Cir. 1968), "[a]lthough the right of cross-examination is absolute, it is not unrestricted; the scope of such examination may be limited by the trial judge in the exercise of his discretion." The principal question before us, therefore, is whether the trial court's restrictions on cross-examination were within reasonable bounds of discretion.

The defense wanted to get before the jury that the Drug Enforcement Administration (DEA), in return for Patricia Brown's promise to cooperate in the apprehension and prosecution of dealers in controlled substances, promised her that it would attempt to persuade state authorities to drop felony charges against her. The defendants made a proffer to this effect, but the trial court prohibited this line of questioning before the jury. However, the substance of the testimony produced in the defendants' proffer ultimately came before the jury. Specifically, Patricia Brown admitted in open court that she had gone to work for the DEA two weeks after she was arrested by local officials and because she had been arrested, that the state officials told her that if she "cooperated [she] could help [herself]," and that she began to work for the federal government in order to "get . . . off the hook."

■ To be sure, the admission of this evidence tending to show bias on the part of the government's witness occurred after the defense was restricted in the scope of its cross-examination. This makes the instant case somewhat dissimilar to *Samuels v. United States,* 398 F.2d 964 (5th Cir. 1968), and *Gordon v. United States, supra.* Those cases both held that particular restrictions on cross-examination did not constitute reversible error where the substance of the desired impeaching information had

or the defendant; the witness's interest, if any, in the outcome of the case; his manner of testifying, his candor, fairness and intelligence; and the extent to which he has been corroborated or contradicted, if at all, by other credible evidence.

The testimony of police officers or of Government agents is to be subjected to the same tests and given the same consideration as that of any other witness, no more and no less weight is to be given such testimony because of the official capacity of the police officer or Government agent.

already been presented to the jury. But the important factor, obviously, is not *when* the information gets to the jury but *that* it gets to the jury. Any actual restrictions on cross-examination were, therefore, permissible limitations on scope.

The next limitation on cross-examination pointed out by the appellants is the trial court's refusal to allow the defense to show that Patricia Brown received large sums of money for each arrest for which she was responsible. The record shows, however, that the substance of this information was also before the jury. Patricia Brown testified that she was paid by the government on a case-by-case basis, that she received $1,700 on the first case she worked on, that she received $1,000 for her activities in the instant case, that one of the reasons she went to work for the government was her need of money, that she was informed that she might receive $5,000 in the instant case if ten pounds of cocaine were seized, and that she was "very desirous of acquiring that $5,000." Here, too, it is clear that there was no denial of cross-examination but merely what amounted to reasonable restrictions on its scope.

 Finally, Onori's counsel tried to explore T-Bo Brown's understanding of the maximum sentence he could have received had he not agreed to cooperate with the prosecution. The record shows that T-Bo Brown admitted that he discussed the maximum penalty under some of the dismissed counts with a man (presumably his attorney), but that he was not aware of the fact that each of the four dismissed counts independently carried a possible fifteen-year sentence. Brown testified, in fact, that he did not know "which sentences carried what penalty." This denial, in want of any showing that it was not sincere, would be sufficient to sustain the trial court's actions. *Gordon v. United States, supra.* Moreover, through the questions asked and the trial court's comments in response to the government's objections, the jury was informed that the dismissed counts against T-Bo Brown carried maximum sentences of fifteen years. The jury was adequately, if not

conventionally, advised about the maximum penalty that Brown could have feared. Despite the intervention of the trial judge, the primary impeaching material was presented to the jury.

In conclusion, therefore, none of the alleged denials of cross-examination require reversal.

## VI. USE OF TRANSCRIPTS

The most serious objection to the trial proceedings relates to the court's use of the tape recordings, and transcript thereof, made of the December 5 conversation in Bukky's apartment between Patricia Brown, Onori, Bukky and Stegman. After foundation testimony by Agent Annabelle Grimm, the court admitted the tapes into evidence. Grimm also testified that she had listened to the tapes, transcribed them, and checked the transcription against the tapes. Finally, she testified that the transcripts truly and accurately reflected what she heard when she monitored the original conversation via a radio receiver. The prosecution then requested permission to distribute Grimm's transcript to the jury. The trial court allowed the transcript to be given to the jury but cautioned the jury that

> [t]he tapes themselves are the primary evidence of what was or was not recorded. The transcript will be furnished to you only for your convenience in being able to follow these conversations and identify the voices which are claimed to have been the person speaking.
>
> \* \* \* \* \* \*
>
> You must make up your mind what is said on the tapes or if it is intelligible or unintelligible or what, but you must listen to the tapes themselves, and you cannot rely on this transcript as the evidence, but it will assist you in following whoever is talking because, otherwise, all you will hear is voices, and you will not have any idea who is supposed to have been the person speaking, and it is solely for that limited purpose that I will permit you to have the transcripts.

Notwithstanding this cautionary instruction, the defense objected to this use of the

transcripts. Counsel pointed out that he had filed an affidavit with the court stating that the voices on the transcript had been misidentified in many places. The court overruled this objection and stated that defense counsel could attack the accuracy of the transcript later in the trial. During the subsequent playing of the tapes, defense counsel noted for the record that the jurors appeared to be reading the transcripts rather than listening to the tape. The trial court refused to take the transcripts from the jurors and refused to grant a mistrial sought at this time.

The testimony of Paul Array, an expert in tape identifications, was proffered by the defendants. Array testified, outside the presence of the jury, that there were more than fifty errors in the government's transcript of the conversation; he began a point-by-point analysis of those errors. The trial court was prepared to allow Array to testify to the jury, but the court indicated that such testimony would mean that both the government's and the defense's transcripts could go to the jury to help it decide the question of which portions of each transcript were correct. The defense, contending that the government's version of the conversation was highly prejudicial, rejected this offer. Another motion for mistrial was denied, and the defendants rested their case.

On appeal, Onori and Bukky contend that the court's actions with respect to the transcript and the conditions placed on Array's proposed testimony constitute reversible error. In the circumstances of this case, we disagree. We do feel, however, that the best procedure for the use of transcripts was not followed in this case. We attempt, therefore, to review this problem area in some depth and to suggest more appropriate means of dealing with contested transcripts.

First, we note that the use of tape recordings obviously is acceptable as long as a proper foundation has been laid and that recordings constitute real, as opposed to testimonial, evidence. The need or desire for transcripts arises generally from two circumstances. First, portions of a tape may be relatively inaudible. Second, without the aid of a transcript, it may be difficult to identify the speakers. In either of these cases, it has been said that it is within the discretion of the trial court to allow a transcript to be used by the jury *"to assist the jury as it listens to the tape."* *United States v. McMillan,* 508 F.2d 101, 105 (8th Cir.), *cert. denied,* 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1974) (emphasis added). It is, perhaps, the vagueness of this notion of "assistance," referred to in the trial court's special instruction, that is a major factor in the confusion surrounding the correct procedure for the use of transcripts.

We believe that the use of a transcript as a guide is analogous to the use of expert testimony as a device aiding a jury in understanding other types of real evidence. For example, an issue in a case may be whether John Doe's purported signature on a document is actually John Doe's signature. Two handwriting experts may disagree, and if they are asked to testify on each side of the dispute, their divergent testimony creates a jury issue. Similarly, a given tape recording, which we emphasize is just another piece of real evidence, may be subject to numerous understandings. Here two "experts"—Grimm (and her transcript) constituting one, and Array (and his transcript) the other—were available to aid the jury in determining the real issue presented, the content and meaning of the tape recordings.

It is therefore incorrect to think of the transcripts as simply an "aid"—as better lighting fixtures in the courtroom would be an "aid" to the jury's vision of witnesses—and not as evidence of any kind. They are evidence and, like other evidence, may be admitted for a limited purpose only. That purpose here, as the court outlined in its special instruction, was primarily to establish the identity of the speakers at any particular time.

Given that a transcript is merely another type of evidence, the fallacy in

appellants' threshold contention—that the court had to make an in-camera determination of which portions of the proffered transcripts were "correct"—is obvious. These decisions are precisely the traditional functions of the jury. We conclude that it is unnecessary for the trial court to decide whether a transcript is accurate before that transcript is given to the jury, so long as each side to the dispute is given an opportunity to submit a transcript containing its version of a conversation.

We have previously suggested that a prior judicial determination of accuracy is desirable before a transcript is used to "aid" the jury. *See Fountain v. United States,* 384 F.2d 624, 630 (5th Cir. 1967). Other courts have also made this suggestion. *United States v. John,* 508 F.2d 1134, 1141 (8th Cir.), *cert. denied,* 421 U.S. 962, 95 S.Ct. 1948, 44 L.Ed.2d 448 (1975); *United States v. Lawson,* 347 F.Supp. 144, 149 (E.D.Pa. 1972). None of these cases, however, involves a situation in which the defendants alleged specific errors in the government's transcript. Nor do these cases hold that a judicial determination of accuracy is a *sine qua non* of transcript use.

One court has suggested that a critical factor determining the propriety of using transcripts is an agreement between the lawyers on both sides that the transcripts are accurate. *See United States v. McMillan, supra,* 508 F.2d at 106. This demonstrates that the lawyers may stipulate that a particular transcript is correct just as any other relevant fact may be stipulated, but it does not solve the problem arising when the lawyers do not agree.

In a case where there was a disagreement about the accuracy of a transcript, the Second Circuit found no error in its use as evidence, observing that

[a]n *in camera* hearing was . . . held, prior to the introduction of the tapes or transcripts into evidence . . . . The parties agreed that the transcripts accurately reflected the words on the tapes, with certain exceptions as to which it was agreed that *the transcripts would contain the version believed accurate by each party.* . . . An explanation of how the tapes were made was given to the jury, and the tapes and transcripts were admitted . . . . .

*United States v. Carson,* 464 F.2d 424, 437 (2d Cir.), *cert. denied,* 409 U.S. 949, 93 S.Ct. 268, 34 L.Ed.2d 219 (1972) (emphasis added). *Carson* was cited with approval in *United States v. Bryant,* 480 F.2d 785, 791 n. 4 (2d Cir. 1973), and again explicitly endorsed in *United States v. Chiarizio,* 525 F.2d 289, 293 (2d Cir. 1975), where the court observed that "[i]n cases where the defense and prosecution disagree [on what is an accurate transcript of a recording] . . . the proper procedure is for the jury to receive transcripts of both sides' versions."

So the first efforts of the district court should be to devise a "stipulated" transcript, one to which all sides to the dispute can agree. If one transcript is to be used, as an "aid" or as "evidence," there must be agreement about its accuracy, and a pretrial meeting in chambers may sometimes be necessary to determine if this is possible.[5]

If no "official" transcript is developed, *Carson* and *Chiarizio* show that the jury is entitled to consider the divergence in two transcripts of the same conversation, with the recording of it, as a problem of fact to be resolved in the traditional manner. In this event, the judge need not necessarily listen to the tapes or pass on the accuracy of any transcript.[6] A transcript

---

5. Obviously, an in-camera hearing should be scheduled at such a time that it will not unduly interrupt a trial in progress. A pretrial conference would be the preferred manner of handling the problem. Of course, the discretion of the trial court is paramount. We suggest only that the court and parties should foresee this

type of problem and make an effort to deal with it efficiently and expeditiously.

6. While the Second Circuit has also stated that the judge must listen to the tapes and compare them to the transcripts before the jury receives transcripts, even if both versions are available, the policy behind this requirement applies only

can be prepared containing both versions of disputed portions. *See United States v. Carson, supra.* In the alternative, the jury can be given two transcripts, given the reasons for the disputed portions, and instructed that they are to determine for themselves which, if either, transcript accurately reflects particular portions of the recording. *See United States v. Chiarizio, supra.* Another possibility is to explain to the jury that there is a disagreement about the accuracy of the government's transcript and to allow the tape, or disputed portions of the tape, to be played twice, once with each transcript. In any of the procedures in which the jury is told that a disagreement exists with respect to the transcripts, each party should be allowed, of course, to present additional evidence supporting the accuracy of its version. As with other forms of potentially prejudicial evidence, the key to protecting a defendant's rights in this situation lies in seeking limiting instructions. Upon request by a defendant, the jury should be instructed that a transcript is just another piece of evidence subject to objections, that it may have to be evaluated for accuracy, and that the jury need not accept any proffered transcript as accurate.

▮ The trial court here understandably did not anticipate the guidelines which we outline today. However, its procedure complied with the essential condition on the use of a disputed transcript because the defendants eventually had an opportunity to present their version of the transcript to the jury and to have their expert testify. The trial court offered to allow the defendants' expert, Array, to testify about errors in the government's transcript and to permit the defendants' version of the transcript to go to the jury. Although the defendants claim prejudice from the judge's ruling on the consequences of such a presentation, sending the government transcript to the jury was clearly appropriate after Array's testimony since the testimony was primarily directed at asserted inaccuracies in that transcript.[7] The failure to present Array's testimony is the result of the deliberate choice of appellants' counsel rather than any judicial error.

▮ The only potential unfairness in the manner in which the transcripts were handled here is found in the jury's understanding of the status of the government's transcript at the time it was distributed. The limiting instructions given here attempted to restrict the purposes for which the transcript was to be used, but they were technically inadequate because they presumed that the jury would rely on it for those limited purposes. That is, they left the jury with the misleading impression that the speaker identifications in the transcript were unquestionably accurate. However, the defendants did not request a more precise limiting instruction, and the inadequacy was harmless; our independent review of the two transcripts demonstrates no reasonable probability that the indicated differences in identification between the two transcripts could have affected the verdict.

The judgments of conviction are AFFIRMED.

---

when a transcript is presented to the jury as a correct version of the tape. *See United States v. Bryant, supra,* 480 F.2d at 789.

**7.** There was more than ample foundation presented in this case to support the admission of Grimm's transcript. Grimm was not with the federal agent actually recording the conversation but received the tapes from him and kept them in her possession until she transcribed them. Moreover, she testified that she was able to distinguish Onori's voice from Bukky's voice. Onori's had more of a nasal, Eastern accent. Bukky's voice was softer, and he had a Midwestern accent. Finally, Patricia Brown, a participant in the conversation, aided Grimm in identifying the speakers on one portion of the recording.