UNITED STATES of America,
Plaintiff-Appellee,

v.

Jean Charles ROCHAN, Andre Ethier
and Serge Brochu,
Defendants-Appellants.

No. 76–3162.

United States Court of Appeals,
Fifth Circuit.

Dec. 1, 1977.

R. Emmett Harris, Uvalde, Tex. (Court-appointed), for Rochan.

Curtis D. Glover, Paul D. Eaton, Dallas, Tex., for Ethier & Brochu.

Jean Charles Rochan, pro se.

John Henvey, William M. Walls, Dallas, Tex., for defendants-appellants.

Jamie C. Boyd, U. S. Atty., LeRoy Morgan Jahn, Robert S. Bennett, Asst. U. S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before WISDOM, GEWIN and AINSWORTH, Circuit Judges.

WISDOM, Circuit Judge:

A jury convicted Serge Brochu, Andre Ethier, and Jean Charles Rochan, defendants/appellants, on a five-count indictment charging them with federal offenses related to the importation of marijuana into this country from Mexico.[1] On appeal, the appellants raise a number of issues, only two of which need be discussed. (1) They contend that statements by the prosecutor and the trial judge constituted comment on their failure to testify. (2) They contend that transcripts of consensual tape recordings used to aid the jury in listening to the tapes were inadmissible because the stenographer who transcribed them did not authenticate them. We find that these and

---

1. The three defendants were charged with conspiring to import marijuana in violation of 21 U.S.C. §§ 952(a), 960(a)(1) and 963, conspiring to possess marijuana with the intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846, and aiding and abetting Jesse Juarez, an alleged co-conspirator who was a fugitive from justice at the time of the trial, and the possession of marijuana with the intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Brochu was also charged with aiding and abetting Rochan in the importation of marijuana in violation of 21 U.S.C. §§ 952(a) and 960(a)(1) and 18 U.S.C. § 2 and with aiding and abetting Rochan in the possession of marijuana with the intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. All three are French Canadians; the conspiracy aimed at the eventual transportation of the marijuana through the United States into Canada.

other contentions are without merit. We affirm.

## I.

On November 11, 1975, Rochan attempted to drive 175 pounds of marijuana across the border into Eagle Pass, Texas. Customs agents searched his station wagon, found the marijuana, arrested Rochan, and placed him in the Val Verde County Jail. Three days later, William Garles, an unindicted co-conspirator who was later to become the government's chief witness in this case, was arrested on an unrelated alien transportation charge and placed in the jail with Rochan. There, Rochan told Garles of the circumstances of his arrest—that he had been arrested because he had failed to follow orders by attempting the crossing at a time and place contrary to his instructions. Rochan also told Garles that he felt he needed to redeem himself for his mistake. Rochan solicited Garles's help in obtaining a new attorney and in smuggling marijuana from Mexico. Garles agreed to help Rochan in both respects. On December 12, 1975, from the Val Verde County Jail, Rochan telephoned Brochu,[2] who wired $5,000 to Rochan in care of Garles's wife. Mrs. Garles was to use this money for her husband's bail and to pay Rochan's attorney. When Garles was released on bail, he called Brochu in Ottawa, Canada, to say that he was out of jail.

On January 2, 1975, Brochu called Garles to pick him up at the San Antonio Airport. There, Garles met Ethier as well as Brochu. The three discussed plans to buy a car suitable for smuggling marijuana and to hire a driver for the border crossing. On January 6, Garles and Ethier bought a late model station wagon in Houston for cash. Garles and Ethier hired Jesse Juarez, an indicted co-conspirator who fled the jurisdiction before trial, to drive the car. Brochu financed these operations by a second Western Union money order to Mrs. Garles in the amount of $5,000.

On January 9, Garles became a government informer. To check on his story, agents of the Drug Enforcement Administration had him telephone Ethier. The conversation, which was tape-recorded, consisted of a discussion of the conspiracy's current project, making Juarez and his family look more presentable so that their appearance would not arouse suspicions in Customs agents. Upon Brochu's return to San Antonio, DEA agents observed him dining with Garles and Ethier and later inspecting the car they had bought. He knocked on the side of the left rear quarter panel and then knelt down to look under that part of the station wagon.

As the next step of the conspiracy, Brochu, Garles, and Juarez met in Mexico City and arranged to load the car with marijuana. Juarez successfully drove the car across the border. Garles obtained possession of the car and delivered it to DEA agents, who inspected it and found 100 pounds of marijuana. Garles left the agents and drove to an apartment in Richardson, Texas; Ethier had rented it for six months as a halfway house for the storage of marijuana. Ethier, however, feared that the house was not safe, and ordered the return of the marijuana to San Antonio.

A few days later, Brochu arrived in Texas. Garles met him at the Fort Worth-Dallas Airport and drove him to the rented house in Richardson. There, on January 24, 1976, DEA agents arrested Brochu and Ethier. After being warned of his rights, Brochu stated that there was nothing wrong with marijuana and that even from jail he would cause thousands of pounds of marijuana to be brought into this country.

## II.

The appellants contend that statements made at trial by the prosecutor and the trial judge constituted comment on failure to testify, a violation of their right to remain silent under the fifth amendment. We disagree.

---

**2.** Brochu used the alias Serge Alderman for a time in his dealings with Garles. Garles identi-

fied the voice he heard over the telephone purporting to be Alderman's as that of Brochu.

After the prosecutor, Mr. Bennett, had listed some of the evidence for the United States in his first closing argument, the following exchange occurred in the presence of the jury:

> [Mr. Bennett]: . . . Now ladies and gentlemen of the jury, what did we hear from the defense in this case? Well, we heard that Mr. Rochan was a model prisoner. We heard that if he is allowed outside of jail—
>
> MR. GLOVER [counsel for Ethier]: Your Honor, I would like to respectfully interject an objection here to the remark, "What did we hear from the defense in this case", as being an allusion or an indirect reference to the failure of the Defendants to testify.

A few moments later, still in the presence of the jury, the colloquy continued:

> MR. HARRIS [counsel for Rochan]: What he said is, "What have we heard from the defense? "We heard that . . . "
>
> THE COURT: Well, the only thing we have heard from the defense was this one witness, which I interpreted him to mean he was a model prisoner. I'll overrule the objection. The only thing I have heard about Mr. Rochan from your last witness who was a jailer was that he was a model prisoner. Now, he may not have used that word, but that's just the inference I think that counsel is drawing from what he said. Well, be sure that you confine your remarks to what this witness said. I think that may be the complaint they are making. All right, go ahead, you may proceed.

■ We hold that neither the trial judge nor the prosecutor improperly commented on the defendants' failure to testify.[3] To reverse for improper comment by the prosecutor, we must find one of two things: that "the prosecutor's manifest intention was to comment upon the accused's failure to testify" or that the remark was "of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify". *United States v. Ward*, 5 Cir. 1977, 552 F.2d 1080, 1083, *quoting Samuels v. United States*, 5 Cir. 1968, 398 F.2d 964, 968, *cert. denied*, 1969, 393 U.S. 1021, 89 S.Ct. 630, 21 L.Ed.2d 566. The same two-pronged test applies to comments made by the trial judge. *Davis v. United States*, 5 Cir. 1966, 357 F.2d 438, 441.

## A. The Prosecutor's Remarks.

### 1. Manifest Intention to Comment.

■ We cannot find that the prosecutor manifestly intended to comment on the defendants' failure to testify, if some other explanation for his remark is equally plausible. In *Samuels v. United States*, 5 Cir. 1968, 398 F.2d 964, 968, we declined to reverse when we found it "very possible" that the prosecutor's statement was "merely inadvertent". *See also United States v. Wilson*, 5 Cir. 1974, 500 F.2d 715, 721. In *United States v. Ward*, 5 Cir. 1977, 552 F.2d 1080, 1083, we approved a prosecutor's remarks when they were "more likely" intended for a proper purpose—to refer to the defendants' failure to produce "evidence of any kind . . . to rebut the inference of knowledge that naturally follows from the possession of recently stolen property" —than to comment on the defendants' failure to take the stand. In the instant case, the prosecutor's rhetorical question "What did we hear from the defense?" could have been intended as a transition in the prosecutor's summarization of the evidence. At the time he made the statement, the government's attorney had been describing his own case, and was shifting his focus. That appropriate motivation seems at least as likely as a manifest intention to comment.

> *v. Jennings*, 5 Cir. 1976, 527 F.2d 862, 871; *Jordan v. United States*, 5 Cir. 1963, 324 F.2d 178 (per curiam); *Garcia v. United States*, 5 Cir. 1963, 315 F.2d 133, 137.

---

**3.** The appellants also assign as improper comment on their failure to testify a statement by the prosecutor that evidence of their guilt was "uncontroverted". We find no error in the circumstances of this case. *See United States*

### 2. Effect on the Jury.

We think the defendants here have not shown that the jury necessarily construed the prosecutor's remark as a comment on their failure to testify. In earlier cases this Court has been slow to find a necessarily improper understanding on the part of the jury. In *Samuels v. United States*, 5 Cir. 1968, 398 F.2d 964, 967–68, we found that the jury did not necessarily construe improperly the remark "G. L. Samuels [the defendant] does not want to talk about these facts." We found that the prosecutor meant to use the name of the defense lawyer rather than that of the defendant, and that "The context in which it was made indicates that the remark was directed to the argument of counsel and not to the defendant's failure to testify." In *United States v. Toler*, 5 Cir. 1971, 440 F.2d 1242, 1243, we considered a government attorney's statement in a prosecution for filing a false medical claim for Social Security benefits. The prosecutor said "at no time has he [the defendant] denied filing it". We found that this case was a comment "not on defendant's failure to testify, but rather on the uncontradicted state of the evidence". *Id.* at 1243.

We hold that the jury in the instant prosecution could reasonably have construed the prosecutor's rhetorical question as a transitional device. We do not approve of this language but the question we face is not whether the remark was proper, but whether the jury would necessarily interpret it as a comment on the silence of the accused. Even so, in other circumstances, this very language could require reversal: for instance, if the prosecutor had begun his argument with the question "What have we heard from the defense?", the jury could not infer a transitional purpose. And we would face a much closer question had the prosecutor asked "What have we heard from the *defendants*?" rather than "What have we heard from the *defense* ?"

### B. *The Trial Judge's Remarks.*

 We find no error in the trial court's response to the defendants' objec-tion. The trial judge's motivation was clearly proper: he was attempting to rule properly on an evidentiary objection. He did not have the requisite manifest intention of commenting on the silence of the accused. *See Davis v. United States*, 5 Cir. 1966, 357 F.2d 438, 441. We also find that the jury did not necessarily take the trial judge's remark as a comment on the failure of the defendants to testify. At worst, the remark was a restatement of the prosecutor's language. The trial judge believed that the prosecutor's remark was proper summarization and he rephrased it in discussing the objection with counsel for the defendants. A clear effect on the jury is required to reverse for comment by the trial judge. The kind of effect required is shown in *Davis v. United States*, 357 F.2d at 440–41 & n.5, where we found reversible error when the trial court repeatedly asked defense counsel to refrain from cross examining the government's witness because the attorney could get his own witnesses to explore matters not covered on direct examination. There, the trial judge said "You can have your own people and they can testify if you want them to . . . . You call your own witnesses to testify. . . Call your own witnesses. . . . Bring ['your people'] up here and put them under oath . . . ." *Id.* at 441 n.5. In that case, no one but the defendants could have provided the missing testimony. *Id.* at 441.

The effect on the jury of the trial court's remark in the instant case, unlike that in *Davis*, was minimal or nonexistent. The statement added nothing to the remark of the prosecutor, a remark that does not require reversal either alone or in conjunction with this statement by the trial judge.

### III.

In *United States v. Onori*, 5 Cir. 1976, 535 F.2d 938, 946–49, we held that an authenticated transcript of a consensual tape-recording is admissible to supplement the jurors' hearing of the tape. We now face the question of the requirements for authenticating a supplemental transcript.

■ At trial, the jury listened to tape-recordings of conversations between Garles and Brochu and between Garles and Ethier. These tapes were admissible, because Garles consented to their making. *See United States v. White*, 1971, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453; *Fountain v. United States*, 5 Cir. 1967, 384 F.2d 624, 630, *cert. denied, sub nom. Marshall v. U. S.*, 1968, 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105; *United States v. McMillan*, 8 Cir. 1974, 508 F.2d 101, 104, *cert. denied*, 1974, 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782.

The government supplied the jurors with transcripts of these recordings prepared by a government stenographer. The trial court instructed the jury that the transcripts were merely the government's version of what had happened. Garles, who had been a participant in each conversation, testified that each transcript was accurate. At no time, however, did the stenographer who had typed the transcripts testify.

■ As we have noted, *United States v. Onori* allows the admission of authenticated transcripts of consensual tape-recordings for the limited purpose of aiding the jury in understanding the tapes. The need for supplemental transcripts—those used to assist the jury as it listens to the tapes—arises for two reasons. First, portions of the tape may be inaudible or difficult to hear when replayed in the courtroom; second, the supplemental transcript may help identify the speakers. *United States v. Onori*, 535 F.2d at 947; *United States v. McMillan*, 8 Cir. 1974, 508 F.2d at 105. In *Onori* we outlined the procedures to be used when transcripts supplement tapes. First, the parties in the trial court should seek to arrive at a " 'stipulated' transcript, one to which all sides to the dispute can agree". 535 F.2d at 948. If the parties cannot agree, each side should produce its own supplemental transcript, or its own version of the disputed portions. Each party is also free to put on "additional evidence supporting the accuracy of its version". 535 F.2d at 949.

In *Onori*, we found that these factors provided "more than ample foundation" for the admission of the supplemental tran-scripts. 535 F.2d at 949 n.7. The prosecution put on evidence to show (1) the tapes had been in the custody of the government from the time of their making until transcription, (2) the stenographer typed the transcripts while listening to the tapes, (3) the voices of the participants were accurately distinguished. In the instant case, the appellants did not object to the admission of the *tapes*, and they do not now contend that the tapes had been altered or replaced by the time of trial. Thus, we need not examine the first *Onori* factor, a proper chain of custody.

■ We must determine whether Garles's testimony that the supplemental transcripts conform to the conversations he participated in is a sufficient foundation for their admission. We find it is. The stenographer who typed the supplemental transcript need not testify, if one of the parties to the taped conversation testifies that the transcript is correct.

■ Usually, writings admitted in evidence must be authenticated to show "the existence of some connection between that writing and a particular individual". Cleary, McCormick on Evidence, § 218, at 543. But the issue in the authentication of supplemental transcripts is not who made them; the issue is whether they are accurate. Therefore, there must be some evidence that the transcripts are accurate— that the words are accurately reproduced and the voices accurately identified. Usually, one of the participants in the conversation will identify the voices in accordance with Federal Rule of Evidence 901(b)(5); that participant is also qualified to testify that the transcript faithfully reproduces the taped conversation. In this respect, a supplemental transcript is like a photograph that supplements the testimony of a live witness. Cleary, McCormick on Evidence, § 214 at 530–31; 3 Wigmore's Evidence (Chadbourn rev.) § 790 at 218. "[T]he witness who lays the foundation need not be the photographer nor need he know anything of the time, conditions, or mechanisms of the taking"; he need only be familiar with the object the photograph represents. McCormick on Evidence, § 214 at 531.

Of course, the "foundation *may . . .* be laid by having the person who prepared the transcripts testify". United States v. McMillan, 508 F.2d at 105 (emphasis added). But the stenographer's testimony is unnecessary if someone else who either heard the tape or participated in the conversation assumes that task. The *Onori* procedure, bringing to the jury conflicting parallel versions of controverted portions of the supplemental transcript, guards against erroneous supplemental transcripts much more effectively than would a procedure requiring the transcriber to testify. The *Onori* procedure allows the jury to judge the accuracy of the transcript, which is really at issue, rather than the transcriber's credibility in testifying that he made an accurate transcript. Requiring the testimony of the stenographer in all cases would be a time consuming and expensive formality.

We have considered the other contentions of the appellants. We find that they are without merit. There was no variance between the charges in the indictment and what was proved at the trial; moreover the defendants had fair notice to enable them to prepare for trial. The record of a continuing conspiracy justified the admission of statements by a coconspirator objected to for the reason, among others, that the statements were not in furtherance of the conspiracy. Much of the testimony now disputed was elicited without objection by defense counsel, and the trial judge gave the appropriate "Apollo" limiting instruction. The trial judge did not abuse his discretion in allowing a pistol, found in a codefendant's possession, to be introduced in evidence. The evidence was sufficient to sustain Brochu's conviction for aiding and abetting the importation of marijuana. There was no substantial conflict between the oral pronouncement of sentence and the written judgment. The double jeopardy principle is inapplicable in this case. Some of the alleged objectionable hearsay was admissible under the coconspirator exception, some admissible as an exception to Fed.R.Ev. 802. Given the overwhelming evidence of the defendants' guilt, the availability of Garles for cross-examination, and the district court's limiting instructions during the trial and in the charge to the jury, error, if any, was harmless.

The judgment is AFFIRMED.