**AFFIRM; Opinion Filed June 27, 2022**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-21-00271-CR**

**ROSS ANTHONY SCOTT, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 422nd Judicial District Court**
**Kaufman County, Texas**
**Trial Court Cause No. 18-10103-422-F**

# MEMORANDUM OPINION

Before Justices Schenck, Osborne, and Smith
Opinion by Justice Schenck

Ross Anthony Scott appeals his conviction for the murder of Henry Snider,

Jr., challenging certain of the prosecutor's comments during closing arguments at

both phases of trial. Finding no error, we affirm. Because the issues are settled in

law, we issue this memorandum opinion. TEX. R. APP. P. 47.4.

## BACKGROUND

Appellant met Mr. Snider on or about February 17, 2018. That evening,

appellant and Wendy Oliver, a woman with whom appellant was in a relationship,

were driving back to the camper they resided in. Appellant had been drinking all

day. On their way home, at about 7 o'clock in the evening, Ms. Oliver spotted a light on the side of the road in a ditch.

Appellant told Ms. Oliver to pull over. He then exited the vehicle and told Ms. Oliver to park the car nearby, while he went to see if the light belonged to someone who needed assistance. Appellant walked down into the ditch. After parking the car, Ms. Oliver walked down to join appellant and discovered that Mr. Snider, who was homeless, had set up a camp in the culvert and was turning a flashlight on and off. Deputies from the Kaufman County Sheriff's Office arrived soon after.

When Ms. Oliver realized appellant intended to take Mr. Snider home with them, she told appellant she would not be staying and would take her belongings with her.[1] The previous year, in 2017, appellant had invited another homeless man to live with them. Ms. Oliver had been unhappy with that arrangement because appellant would spend late nights "hanging out" with that man while Ms. Oliver cooked and cleaned for the men. That arrangement lingered until the homeless man left without explanation. Appellant was upset that Ms. Oliver did not plan to stay. Ms. Oliver told appellant that Mr. Snider made her feel very uncomfortable.

---

[1] A picture of the text Ms. Oliver sent to her friend that night was admitted at trial:

[Appellant] is picking up another homeless person n (sic) I'm not going to stay there, done been thru (sic) that shit before n (sic) not doing it again. So we are on side of road (sic) loading up his shit with 2 KSO deputies behind us on road (sic). As soon as we get to house I will get my shit n (sic) head ur (sic) way.

The deputies drove Mr. Snider to the camper where appellant lived. One of them made a comment to Ms. Oliver that Mr. Snider seemed "a little off [mentally]." Ms. Oliver drove herself and appellant to the camper, put her tools that they had used that day on the porch, went inside to pack her belongings, and left to stay at a friend's house. When she left, it was about 8 or 9 o'clock at night, and appellant and Mr. Snider were drinking, though she was uncertain if it was alcohol or water.

After Ms. Oliver reached her friend's house, she and appellant called and texted once or twice per hour for a few hours. Ms. Oliver told appellant that if he would promise to take Mr. Snider anywhere he wanted to go the next day, she would return to their camper. During the calls with appellant, Ms. Oliver could hear Mr. Snider in the background occasionally shouting angrily and using profanity.

Ms. Oliver decided to return to the camper after appellant texted her that he was leaving but did not subsequently respond to her texts or calls. Ms. Oliver was concerned about appellant because he did not have a car of his own. Ms. Oliver's friend attempted to talk her out of returning for about an hour, but Ms. Oliver ultimately drove back to the camper.

On her way back, Ms. Oliver called appellant. He answered the phone with a quiet and weak voice. When she told him she was on her way to the camper, he told her not to come back. She nevertheless returned and found appellant sitting on the porch steps, seeming to her to be subdued and "in a weakened state." Appellant's

–3–

face showed signs of having been in a fight, including swelling around one eye and his jaw.

Appellant told Ms. Oliver that Mr. Snider had attacked him and that he had killed Mr. Snider. Ms. Oliver went inside the camper and saw Mr. Snider's body, as well as a wooden paddle that appellant had kept in the kitchen. The paddle was stained with blood. After Ms. Oliver confirmed that Mr. Snider was indeed deceased, she went back out to the porch and asked appellant what had happened. Appellant told her Mr. Snider had started poking him in the chest, had tried to put him in a choke hold, and had hit him. Appellant had hit back at Mr. Snider until Mr. Snider fell to the floor. According to Ms. Oliver, appellant told her, "I knew I shouldn't have. . . . I think I hit him a couple more times on the back of the head when he was down."

Appellant and Ms. Oliver returned inside the camper, and he asked her not to call 9-1-1. Ms. Oliver told appellant she needed to get a drink from her car and used that as an excuse to leave the camper, drive away, and call 9-1-1 to report that Mr. Snider had been killed.

Appellant was charged by indictment with murder, specifically that he struck Mr. Snider in the head and neck with a wooden paddle, thus causing his death. The case proceeded to trial before a jury, who found appellant guilty of the charged offense and, after considering evidence admitted in a punishment hearing, sentenced

–4–

him to life imprisonment and a fine of $10,000. Appellant filed a motion for new trial, which was denied. This appeal followed.

## DISCUSSION

## I. The Prosecutor Did Not Improperly Comment on Appellant's Failure to Testify

In his first issue, appellant urges his constitutional rights were violated by certain of the prosecutor's statements made during closing arguments at the guilt–innocence and the punishment phases of trial. The State responds that appellant failed to preserve any error regarding this complaint because appellant did not object during closing arguments in the guilt–innocence stage, and his objection in the punishment stage was that the comments were "outside the realm of proper argument" and "outside the record of any evidence."

Generally, to preserve error for appellate review, the record must show that an objection was made to the trial court, the grounds for relief were made with sufficient specificity, and the trial court ruled upon the objection. TEX. R. APP. P. 33.1. Further, the contention on appeal must comport with the objection made at trial. *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002). Even if defense counsel had argued to the trial court that the complained-of statements improperly commented on appellant's failure to testify, we conclude, on this record, the complained-of statements do not run afoul of appellant's constitutional rights nor did they result in an improper verdict or sentence.

### A. Law Regarding Comments on Defendant's Failure to Testify

A comment on a defendant's failure to testify violates both the state and federal constitutions as well as Texas statutory law. *Randolph v. State*, 353 S.W.3d 887, 891 (Tex. Crim. App. 2011) (citing U.S. CONST. amend. V; *see Griffin v. California*, 380 U.S. 609, 615 (1965) ("the Fifth Amendment, in its direct application to the Federal Government, and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt"); TEX. CONST. art. I, § 10; TEX. CODE CRIM. PROC. art. 38.08). In assessing whether the defendant's Fifth Amendment right has been violated, courts must view the State's argument from the jury's standpoint and resolve any ambiguities in the language in favor of it being a permissible argument. *See Randolph*, 353 S.W.3d at 891. Thus, the implication that the State referred to the defendant's failure to testify must be a clear and necessary one. *See id.* If the language might reasonably be construed as merely an implied or indirect allusion, there is no violation. *See id.*

As the Fifth Circuit has stated, "We cannot find that the prosecutor manifestly intended to comment on the defendants' failure to testify, if some other explanation for his remark is equally plausible." *See id.* (quoting *United States v. Rochan*, 563 F.2d 1246, 1249 (5th Cir. 1977)). The test, then, is whether the language used was manifestly intended or was of such inherent character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify. *See id.* In

–6–

applying this standard, the context in which the comment was made must be analyzed to determine whether the language used was of such character. *See id.*

In general, proper jury argument falls within one of four areas: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to an argument of opposing counsel, and (4) plea for law enforcement. *See Freeman v. State*, 340 S.W.3d 717, 727 (Tex. Crim. App. 2011) (citing *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008)).

### B.    *Complained-of Statements*

Appellant complains of the following comments made during closing arguments in the guilt–innocence phase of trial.[2]

The first comment appellant complains of is the following sentence from the beginning of the prosecutor's closing statement:

> Ladies and gentlemen, first of all, thank you so much for your time and attention. We told you, I can't believe that was just yesterday, that this probably would be a really quick case because we kind of know. We know the evidence. We know, I know what I'll bring you. **I don't get to know what they'll bring you, but I get to know what I'll bring you.**

---

[2] Appellant argues the "seed of these comments were planted during voir dire when the prosecutor highlighted appellant's right to present evidence":

> Meaning if there was something, they [defendants] have the same subpoena power, things of that nature, to get people here.

That statement, however, is a neutral description of a defendant's ability to gather evidence and was made as part of an explanation to the jury of how a defendant has that power and may choose not to present any evidence. Additionally, the previous paragraph in the record is the prosecutor's explanation that a defendant is presumed innocent and does not have to testify, and that a jury cannot hold that failure to testify against a defendant.

This comment, in context, was a clarifying statement by the prosecutor that he could estimate the length of a trial based on the evidence he was aware of, although he could not say for certain in part because the State does not and cannot know what exactly defense counsel will offer or argue.

The second statement appellant complains of in context is a summation of the evidence.

> That's our, that's our evidence right there. Okay. So then what you have to do is what? Remember, the defense can sit there, they can do nothing, absolutely they have the right to do that. **But if they choose to put on a defense, then you get to judge their evidence just as you would our evidence.**
>
> **So of course you have what? What do we get to look at? Now that we kind of get a look at everything that you know about this case, this defendant, what you did get to hear**, and see if it applies, see if it applies to the law. We're big believers in self-defense. Absolutely. No doubt about it. Self-defense when it applies, absolutely. This is not that case.

The third statement similarly appears to be a summation of the evidence presented at trial.

> All this stuff about a fight and who did what. Guess what, folks? That's if you believe his story 100 percent. **What do you think a defendant's going to say?** Well, what really happened is, you know, I was being a little weird to him. He didn't like it, and whatever. So I got mad.

The fourth and fifth statements are part of the prosecutor's argument that a jury is permitted to determine for themselves whether a defendant accused of murder acted in self-defense or not.

Who lost it? Who lost it completely, went into a rage mode? Was it Henry? Because I didn't see any injuries on him. Didn't see any on him. Who has the rage injuries on them? Who has it?

And you sit and say, oh, well, you know, it's bad. Well, no, he was telling Wendy to come back the whole time. Whole time. I guess Henry was fine then sitting on the couch, playing his guitar. **What do you think the defendant's going to say? Can you imagine if that was it, if that you as a juror just always believed the defendant? Because they kill our witnesses. They kill them.**

Be like me killing the bailiff and going, well, I thought she was going to kill me. You have to believe me. She had a gun. Find me not guilty. Self-defense. I went over and shot her. See how stupid that is?

Because sometimes the body can tell you everything. And that's why we brought this and had to show you these photos. Can you imagine if it was that way where you said, hey, well, he got hit a couple times in the head? It'd change your thought of really what happened, right? Really what happened.

Because you read the law. What's immediately necessary? The defense is almost arguing this, well, anytime we get in a fight, well, if it gets where you're trying to grab me, I'm grabbing you, whatever. **Because we'll never know really what happened right there, right?** But it doesn't matter. I'm going to explain that even under his exact story, he's still guilty of murder.

The sixth statement is a summation of the evidence of what Ms. Oliver

testified appellant told her.

That's not what the law is set up for. Self-defense is absolutely there when it works, and it's set up when it does work. Unlawful deadly force is being used against you. And all you heard at all, there is zero evidence of that except, well, he tried to choke me. **That's it from the defendant. That's it. That's all that's said.** Do you think you can kill somebody from that? Take the charge back, read it thoroughly. I, believe me, it's everything in there. It's ordinary person in the situation. Okay. It's an ordinary person, you put them in there.

Unlike the preceding statements, this argument could be taken to invite jurors to consider the fact the defendant did not offer his own testimony in addition to his general failure to refute the evidence of his guilt. Still, while the above statement could be an indirect allusion to appellant's Fifth Amendment rights, we conclude another explanation is equally plausible, e.g. a summation of what Ms. Oliver testified appellant told her had happened. *See Randolph*, 353 S.W.3d at 891 (quoting *United States v. Rochan*, 563 F.2d 1246, 1249 (5th Cir. 1977)). Moreover, we cannot conclude from the context that the language used above—or in any of the other complained-of instances—was manifestly intended or was in itself such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify. *See id.*

In addition to complaining about the foregoing statements from the prosecutor's closing arguments in the guilt–innocence phase of trial, appellant complains of the following statements made by the prosecutor during closing arguments in the punishment phase.

> But again, as far as the other crime, I'm glad the defense did say some of the things he said about Rhonda and that case. Because think about it, way back then he got charged, arrested for that, and he got put on bond. The defense has had that information since 2017. They've had that. They know it's coming in. They, again, can sit and do nothing or they can put on a defense. Either one. But he said, well, where is Rhonda? Well, he knows good and well Rhonda died.

Appellant urges these comments improperly called for a denial of an assertion of fact that only appellant was in a position to offer and that these comments, combined

–10–

with the foregoing comments made in the guilt–innocence phase, left the jury with the impression that if appellant had exculpatory evidence or was not guilty, he would have testified or presented more evidence.

Not mentioned in the guilt–innocence phase, Rhonda Worsham was introduced to the jury during the punishment phase via testimony from Ms. Oliver and an officer who investigated a reported aggravated assault on Ms. Worsham. Through that testimony and documentary evidence, the State established that at the time of the offense, appellant was on bond for the 2017 aggravated assault of a deadly weapon of Ms. Worsham who was homeless.[3]

Prior to the prosecutor's comments regarding Ms. Worsham, defense counsel argued:

> Anybody can accuse anybody of anything. Isn't it easy to accuse somebody and then not come in here. We never heard from Rhonda. We have no idea what happened out there. Anybody can show photographs of anything to anybody and sure hope that that sticks and try to paint him out to be something that he is not.
>
> What did you know about Rhonda? You heard from Wendy that she was a druggy that was trying to bring drugs into Ross's house. And he had to have her leave or make her leave, and she kept coming back. He

---

[3] According to Ms. Oliver, appellant told her in June of 2017, Ms. Worsham brought illegal drugs to his home, appellant was not happy about that, appellant told Ms. Worsham to leave, and Ms. Worsham returned to appellant's home with another person with a machete. Ms. Oliver testified that appellant believed they intended to attack him, rob him, or both, took the machete from them, and attacked them with it.

The officer testified he responded to a call at a nearby hospital, saw Ms. Worsham's vehicle with blood and deep cuts on the outside of the driver's side, and observed she had severe cuts to the left side of her body, her legs, and her arms that appeared to have been received while trying to get into the car. After interviewing Ms. Worsham, the officer went to appellant's camper where he found a bloodied machete and tire tracks in the front yard. When he made contact with appellant, the officer observed he had blood on his clothing and hands and cuts on his hands.

–11–

told her, get out. So suddenly, they've made him out to be this wild madman without any facing of a confrontation ever facing your accuser.

In the context of the record, the complained-of statements are not commenting on appellant's failure to testify or present evidence, so much as they are a response to defense counsel's rhetorical questions regarding Ms. Worsham's absence from trial or her own failure to testify or otherwise be available for appellant to confront.

Having concluded none of the complained-of comments in context could be understood by the jury to be improper, we overrule appellant's first issue.

## II. The Prosecution's Remaining Arguments Did Not Improperly Direct Jurors Outside the Record

In his second issue, appellant argues the prosecutor committed reversible error by injecting additional facts not within the record during closing arguments in the punishment stage. He further urges that those statements combined with the other complained-of statements addressed above implied appellant had additional knowledge or evidence relevant to the charged offense and any other extraneous offenses referenced during punishment.

During the closing arguments, the prosecutor made the following statements:

But again, as far as the other crime, I'm glad the defense did say some of the things he said about Rhonda and that case. Because think about it, way back then he got charged, arrested for that, and he got put on bond. The defense has had that information since 2017. They've had that. They know it's coming in. They, again, can sit and do nothing or they can put on a defense. Either one. But he said, well, where is Rhonda? Well, he knows good and well Rhonda died.

–12–

The defense counsel objected that the foregoing was "[o]utside the realm of proper argument. Outside any evidence. Way outside the record of any evidence." The following exchange took place outside the hearing of the jury:

DEFENSE COUNSEL: She died from an overdose, not from him.

PROSECUTOR: He knows that.

DEFENSE COUNSEL: Right but.

THE COURT: That's what I'm saying. But you made the impression, reopened the door, but impression left how she died. There's no way to clean that up.

PROSECUTOR: I didn't say from these injuries.

DEFENSE COUNSEL: Well.

THE COURT: That's the best way. Your objection is noted. Make sure you do clear that up. That's the best we can do. But you made the objection. It's preserved.

DEFENSE COUNSEL: Okay.

THE COURT: Do you have any other objection you wish to make?

DEFENSE COUNSEL: No. I think I'm good. Thank you.

The proceedings resumed before the jury as follows:

PROSECUTOR: Yes, Ms. Worsham died, not from these injuries, but she's dead. That's why she's not here.
. . . .

So you can certainly take that into consideration when you go back and for your verdict.

The trial judge later instructed the jury:

[D]isregard that statement . . . about Rhonda Worsham and her being dead. . . . It was outside of the record. I don't believe that that was evidence in the case. So I instruct you to disregard anything that relates to Ms. Worsham, her whereabouts, and her possibly being dead.

As stated above, proper jury argument generally falls in one of four areas: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to an argument of opposing counsel, and (4) plea for law enforcement. *See Milton v. State*, 572 S.W.3d 234, 239 (Tex. Crim. App. 2019). The focus, therefore, has always been upon encouraging the jury to decide the case on the evidence in front of it rather than encouraging juries to reach a decision based upon information outside the record. *See id.* at 240. This is because improper references to information outside the record are generally designed to arouse the passion and prejudice of the jury, and, as such, are inappropriate. *See id.* Further, arguments must stick to matters that are in evidence or inferable from the evidence; it cannot be "abusive or inflammatory." *See id.* at 241.

Generally, the bounds of proper closing argument are left to the sound discretion of the trial court. *See id.* at 240. And an instruction to disregard will generally cure error if a prosecutor mentions facts outside the record. *See Freeman v. State*, 340 S.W.3d 717, 727–28 (Tex. Crim. App. 2011) (citing *Gamboa v. State*, 296 S.W.3d 574, 580 n.12 (Tex. Crim. App. 2009).

To the extent the prosecutor's remarks in part are a response to defense counsel's implied questions of where Ms. Worsham was and the effect her absence from the proceedings had on the case, we conclude those are proper comments. *See*

–14–

*Milton*, 572 S.W.3d at 239. To the extent the prosecutor improperly implied Ms. Worsham died from the injuries she claimed to have sustained from appellant, the comment was brief and the prosecutor later clarified that Ms. Worsham did not die from her injuries, and that is why she was not present at trial. Moreover, the trial court instructed the jury to disregard any statement regarding Ms. Worsham's death or whereabouts. *See Freeman*, 340 S.W.3d at 727–28. Under the circumstances, we conclude the trial court's instruction to disregard was sufficient to cure the error. *See id.*

We overrule appellant's second issue.

### CONCLUSION

We affirm the trial court's judgment.

/David J. Schenck/
DAVID J. SCHENCK
JUSTICE

DO NOT PUBLISH
Tex. R. App. P. 47
210271F.U05



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

ROSS ANTHONY SCOTT,
Appellant

No. 05-21-00271-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 422nd Judicial District Court, Kaufman County, Texas

Trial Court Cause No. 18-10103-422-F.

Opinion delivered by Justice Schenck. Justices Osborne and Smith participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 27th day of June 2022.