[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 24, 2009
THOMAS K. KAHN
CLERK

_____

No. 09-10001
Non-Argument Calendar

_____

D. C. Docket No. 08-00089-CR-FTM-99SPC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RENE ALBA FERNANDEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(November 24, 2009)

Before BLACK, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Rene Alba Fernandez appeals his convictions and sentences for conspiracy to bring aliens into the United States for private financial gain, and attempting to bring and aid and abet the bringing of aliens into the United States for private financial gain. For the reasons set forth below, we affirm.

**I.**

Fernandez was charged with conspiracy to bring aliens into the United States for private financial gain, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(i) and 1324(a)(1)(A)(v)(l), ("Count 1"); and attempting to bring and aid and abet the bringing of aliens into the United States for private financial gain, in violation of 8 U.S.C. §§ 1324(a)(2) and 1324(a)(2)(B)(ii), ("Counts 2 and 3"). These charges were based on a conspiracy to bring Cuban nationals into the United States illegally during two trips – one in November and December 2007 and one in April 2008. Fernandez pled not guilty to all counts and proceeded to trial.

Trial testimony established that the United States Coast Guard, on December 1, 2007, intercepted two vessels – on vessel manufactured by Luhrs and a Fins vessel with registration number FL 8945 NL, carrying 20 Cuban nationals and two individuals claiming to be United States residents. Jose Bello and Luis Lopez Cordero operated the Fins vessel, while Roman Zambrana operated the Luhrs.

Cordero testified at trial that, in November 2007, he traveled on a vessel to

2

Bahia Honda, Cuba to pick up 21 Cuban nationals. He also identified Government's Exhibits ("GEs") 26, 27, and 28 as photo-pack line-ups that he had been shown during interviews with investigators. Defense counsel objected to the admission of the exhibits, but the court overruled the objection. Cordero stated that he had identified an individual pictured in GE 26 as Raul Rodriguez ("Chino") and an individual in GE 28 as Fernandez.

Bello testified that he had talked with Fernandez about smuggling Cubans into the United States, and Fernandez put him in contact with Chino. He stated that Chino and Fernandez drove him to a boat ramp to launch the boat that he drove to Cuba. Bello picked up 20 people in Cuba, but on the way back to the United States, the boat ran out of gasoline. On cross-examination, in response to defense counsel's questioning, Bello testified that he was 28 years old and that his girlfriend, Adrianna Rodriguez, was 15 or 16 years old when she gave birth to his son. The government objected to this testimony as irrelevant. The court sustained the government's objection, but refused to strike Bello's testimony.

Steven Buckner, a Machinery Technician Third Class Supporting Officer with the Coast Guard, testified that, on August 23, 2007, he boarded vessel FL 8945 NL to conduct a safety inspection. He recalled that Chino and Fernandez were on board. Buckner reviewed his report, which, he stated, listed Fernandez's

3

address as 2231 Northwest 7th Place, Cape Coral, Florida, and his telephone number as (239) 810-6152. Buckner stated that he would not recognize Fernandez if he saw him, because he did not remember what Fernandez looked like. After Buckner testified, the court asked the parties whether Buckner's testimony was hearsay, since he could not identify Fernandez. The court ultimately determined that it would not strike Buckner's testimony, but noted that the government would have to establish, through later circumstantial testimony, that the individual Buckner was referencing in his testimony was actually Fernandez.

Christopher Brown, a Special Agent with ICE, testified that Chino owned a vessel with Florida registration number 8945 NL, which was usually kept on a Real Xtreme boat trailer. He testified that a December 1, 2007 photograph of Fernandez's residence showed an empty boat trailer, consistent with Chino's Real Xtreme boat trailer, parked outside.

Angel Blanco, Libertad Blanco's son, testified that he came to the United States on April 14, 2008 on a vessel carrying approximately 23 Cubans. Blanco's sister, Anola, was also on the boat.

Libertad Blanco ("Libertad") testified that she once told Fernandez that she wanted to bring her children from Cuba to the United States. Fernandez told her that she would have to pay $10,000 per person once they arrived in the United

States. She stated that Fernandez introduced her to Chino and she agreed to pay $20,000 by April 22nd. On May 22nd, Libertad still had not paid Chino, and she decided to alert law enforcement, because of intense phone calls and threats between Chino and Fernandez, which Fernandez then relayed to her.

Libertad met with Fernandez at a restaurant to introduce him to an undercover law enforcement agent, named Roberto, (subsequently referred to as "Gonzalez"). Libertad was asked about the understanding that was reached at the end of the meeting. She replied, "[t]hat between [Gonzalez] and [Fernandez], they would take a boat to Cuba, they would bring more people, and my –." At this point, defense counsel objected, stating that Libertad's testimony was hearsay. The court overruled the defense's objection. Libertad explained that a boat would be made available to bring in more people from Cuba: "[Gonzalez] and [Fernandez] agreed that they would put a boat out to Cuba. [Fernandez] would be in charge of everything, and they would – that would pay off my debt, the $20,000 debt that I had."

A few days after the meeting at the restaurant. Libertad and Gonzalez met Fernandez, Fernandez's wife, Chino, a man named Sergio, and two other individuals, at the garage where Fernandez worked. Sergio wanted Libertad to pay him the $20,000, because he was the person who had brought Libertad's children

into the country.  At the conclusion of the meeting, Libertad was given one more month to repay the money.  Libertad explained that Chino owed Fernandez $15,000 – $10,000 for boat repairs, and $5,000 for "an outing that he had been on."

Maria Conde, a translator, recognized GEs 31-A, 31-B, 32-A, 32-B, 33-A, 33-B, 34, 34-A, 35, 35-A, 36, and 36-A, because she "worked on them" and "produced them."  She explained that another employee in her office listened to the tapes and did the transcription, and that she then reviewed the transcripts in conjunction with the recordings to ensure their accuracy.  She stated that GEs 31-B, 32-B, and 33-B were true and accurate transcripts of GEs 31-A, 32-A, and 33-A; and GEs 34-A, 35-A, and 36-A were true and accurate transcripts of GEs 34, 35, and 36.

Selecio Gonzalez, a U.S. Customs and Border Protection Agent, testified that he participated in the investigation of Fernandez, using the undercover name "Roberto."  Gonzalez identified GE 33-B as a transcript a conversation he had with Fernandez.  Defense counsel objected to the introduction of GEs 31-A, 31-B, 32-A, 32-B, and 33-B, "based upon the fact that a proper predicate has not been established."  The court overruled the defense's objection and admitted the exhibits.

6

During a meeting between Gonzalez, Fernandez, and Libertad, Fernandez discussed the December 2007 smuggling trip, stating that "we lost that trip." Fernandez also explained to Gonzalez that, of the 23 Cubans that were brought into the country with Libertad's children, 18 people had paid. He stated that "[w]e gave 20,000 dollars for gas." Gonzalez testified that Fernandez told him that Chino owed him $7,000 – $5,000 "from a prior incident," and $2,000 for assisting Sergio in his trip to Cuba.

Paul Mangone, a Senior Special Agent with the U.S. Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), identified GE 21 as two pieces of paper that he removed from a small black notebook found in a filing cabinet in Chino's home. Defense counsel objected to the admission of the exhibit "on relevancy grounds," but the court overruled the objection.

Christopher Brown identified GE 23 as a receipt from Atlantic Radio Telephone reflecting the purchase of 150 prepaid minutes for an Iridium satellite phone. Defense counsel objected to admission of the receipt, but the court overruled the objection, subject to later testimony connecting the receipt to Chino and Fernandez. Brown testified that the receipt, dated April 3, 2008, was found in Chino's vehicle. Brown also testified that Fernandez's wife, Maria Perez, owned a cell phone with the number (786) 539-6591. The government then asked the court

to rule on the admissibility of Buckner's previous testimony, noting that the phone number given by Buckner "is the same phone number that the witness just testified that record relates to." Defense conceded that the court could "admit [Buckner's testimony] now." The court admitted Buckner's previous testimony.

Brown testified that tracking data showed that the Luhrs vessel departed a home in Pirate Harbor, Florida at 1:56 am on November 29, 2007, and traveled to a destination near the coast of Cuba. Between November 28 and December 3, 2007, a satellite phone associated with the Luhrs vessel called Perez's cell phone 17 times, and Chino placed 62 calls to Perez. He stated that the Iridium satellite phone linked to the receipt found in Chino's vehicle traveled from Cape Coral, Florida to Cuba, and then back to Florida between April 11, 2008 and April 13, 2008. Between April 10 and April 15, 2008, Chino called Perez's phone 26 times, and Perez called Chino 45 times.

Joseph Gonzalez, a Special Agent with ICE, testified that Fernandez told him during an interview "that Chino pays him approximately $1,000 as a finders fee per person." Fernandez also told Joseph Gonzalez that Chino owed him about $5,000 for introducing Libertad to Chino and arranging for her family to be brought to the United States.

After Joseph Gonzalez's testimony, the government rested. Fernandez

8

moved for a Fed.R.Crim.P. Rule 29 judgment of acquittal on all counts, and the court denied the motion.

Perez testified that her 17-year-old daughter, Adrianna Rodriguez, began a relationship with Bello when she was 14 years old and had a two-year old son with him.

Fernandez testified that Libertad once asked him if he knew anyone that could bring her children into the United States. He introduced Libertad to Chino, telling Libertad that Chino might know someone that could help her bring her children into the country. He stated that he never asked Libertad for money for introducing her to Chino. Fernandez denied driving with Bello and Chino to a boat ramp to launch the Fins vessel. He also stated that he did not know that Chino was involved in Cuban smuggling. When asked about his comments to Gonzalez in reference to the December 2007 smuggling trip, Fernandez stated "that trip is not mine and I don't have anything to do with it."

After Fernandez's testimony, the defense rested, renewed its previous objections, and again moved for a Rule 29 judgment of acquittal with respect to Counts 1, 2, and 3. The court denied the Rule 29 motion. The jury found Fernandez guilty of all three counts, and it found that Fernandez committed all three offenses for purposes of private financial gain.

9

The presentence investigation report ("PSI") set Fernandez's base offense level at 12, pursuant to U.S.S.G. § 2L1.1(a)(3). Fernandez received a 6-level increase under § 2L1.1(b)(2), because his offense involved at least 43 illegal aliens. His base offense level was increased by an additional two levels, pursuant to § 2L1.1(b)(6), because the offense involved "intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person." Fernandez also received a two-level enhancement under § 3C1.1, for obstruction of justice based on his false testimony at trial. Fernandez's total offense level of 22 combined with criminal history category VI to yield a guideline imprisonment range of 63 to 78 months. Fernandez objected to the application of the § 2L1.1(b)(6) and § 3C1.1 enhancements.

At the sentencing hearing, Fernandez argued that he should not receive a two-level enhancement for obstruction of justice, because he testified "based upon what he thought the facts of the case were" and his testimony was not material, since the jury found him guilty of all counts. The court determined that the § 3C1.1 enhancement was warranted, based on Fernandez's testimony that (1) he did not accompany Bello and Chino to launch Chino's speedboat, (2) he did not know that Chino was involved in Cuban smuggling, and (3) he did not have anything to do with the alien smuggling trip. With respect to the § 2L1.1(b)(6)

10

enhancement, Fernandez argued that there was no evidence that the particular vessels used in the smuggling operations were unsafe. The court overruled Fernandez's objection.

The court adopted the factual statements and guideline calculations set forth in the PSI, stated that it had considered the § 3553(a) sentencing factors, and noted that Fernandez was involved in two separate transactions and was an active participant in both, although Chino was "more the organizer" than Fernandez." The court sentenced Fernandez to 63 months' imprisonment on each count, to run concurrently with one another, followed by a term of three years' supervised release on each count, to run concurrently.

## II.

*Substantial Evidence Supporting Convictions*

We review challenges to the sufficiency of the evidence in criminal cases <u>de novo</u>, viewing the evidence in the light most favorable to the government. <u>United States v. Williams</u>, 527 F.3d 1235, 1244 (11th Cir. 2008). "[E]vidence is sufficient to support a conviction if a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." <u>Id.</u> (internal quotations omitted). We "assume that the jury made all credibility choices in support of the verdict" and "accept all reasonable inferences that tend to support the government's case." <u>Id.</u>

11

### A.     Count 1 – Conspiracy

Pursuant to 8 U.S.C. § 1324(a)(1)(A)(i), it is a crime for "[a]ny person who[,] . . . knowing that a person is an alien, [to] bring[] to or attempt[] to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry. . . ."  8 U.S.C. § 1324(a)(1)(A)(i).  It is also a crime for a person to enter into a conspiracy to commit such an act.  8 U.S.C. § 1324(a)(1)(A)(v)(I).  "The essential elements of criminal conspiracy are an agreement between two or more persons to commit a crime and an overt act in furtherance of the agreement by one of the conspirators."  United States v. Avila-Dominguez, 610 F.2d 1266, 1271 (5th Cir. 1980).  "Once the existence of the conspiracy is established, there must be substantial evidence that each alleged conspirator knew of, intended to join and participated in the conspiracy."  Id.

"The existence of an agreement may be proven by circumstantial evidence, including inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme."  United States v. Silvestri, 409 F.3d 1311, 1328 (11th Cir. 2005) (internal quotations omitted).  Furthermore, the government is not required to "prove that each conspirator agreed with every other conspirator, knew of his fellow conspirators, was aware of all of the details of the conspiracy, or contemplated participating in the same crime."  United States v. Browne, 505

12

F.3d 1229, 1274 (11th Cir. 2007), <u>cert. denied</u>, 128 S.Ct. 2962 (2008).

The evidence at trial established an agreement between Fernandez, Chino, and several other individuals, to bring Cuban aliens into the United States illegally. Libertad testified that Fernandez spoke with individuals who would bring her children to the United States, and later introduced her to these individuals. She stated that Fernandez called to tell her when the vessel had departed from the United States, and later called to inform her that her children had arrived in the country. During a meeting with Gonzalez and Libertad, Fernandez stated that only 18 of the 23 Cubans, brought into the United States with Libertad's children, had paid. Referring to this trip, he noted that "[w]e [paid] $20,000 dollars for gas." Gonzalez testified that Chino owed Fernandez $7,000 – $5,000 from "a prior incident" and $2,000 "for assisting Sergio in showing him the route that he had to take, taking the vessel out to Sergio, [and] meeting the refueler." He later noted that "$2,000 is for sure owed to [Fernandez] for what he did with bringing in [Libertad's] son and daughter, that he admitted to." These assertions are supported by Fernandez's statements during a recorded conversation with Gonzalez. Phone records also showed that, during the April 2008 smuggling operation, in which Libertad's children were brought into the country, Chino called Perez's cell phone 26 times and Perez called Chino 45 times over a 5-day period. Finally, Fernandez

13

himself admitted to Joseph Gonzalez that Chino paid him approximately $1,000 per person as a "finders fee" and that Chino owed him $5,000 for introducing him to Libertad and arranging for her family to be brought. There was also evidence that one of Fernandez's co-conspirators committed an overt act in furtherance of the conspiracy, as Libertad's children were actually brought, illegally, from Cuba into the United States. Fernandez's own statements that he was paid approximately $1,000 per person as a "finders fee," as well as Gonzalez's testimony that Gonzalez was owed $2,000 for assisting Sergio during the April 2008 smuggling operation, similarly support the jury's finding that Fernandez participated in the conspiracy for purposes of private financial gain. Accordingly, viewing the evidence in the light most favorable to the government, there was sufficient evidence to support Fernandez's conviction on Count 1. See Williams, 527 F.3d at 1244.

### B. *Counts 2 and 3 – Attempting and Aiding and Abetting*

Section 1324 also provides for criminal penalties against an individual who, "for the purpose of . . . private financial gain," "knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien." 8 U.S.C. § 1324(a)(2)(B)(ii).

14

To prove an attempt offense, the government must prove (1) that the defendant had the specific intent to engage in the criminal conduct for which he is charged and (2) that he took a substantial step toward commission of the offense. See United States v. Baptista-Rodriguez, 17 F.3d 1354, 1369 (11th Cir. 1994). A substantial step "must be more than remote preparation, and must be conduct strongly corroborative of the firmness of the defendant's criminal intent." United States v. Ballinger, 395 F.3d 1218, 1238 n.8 (11th Cir. 2005) (internal quotations omitted).

To prove a substantive alien-smuggling offense under a theory of aiding and abetting, pursuant to 18 U.S.C. § 2, the evidence must establish that (1) the substantive offense was committed by someone, (2) the defendant committed an act that contributed to and furthered the offense, and (3) the defendant intended to aid in its commission. United States v. Comacho, 233 F.3d 1308, 1317 (11th Cir. 2000).

The attempt charge focused on Fernandez's action with respect to the November-December 2007 smuggling venture. Fernandez's intent to commit that particular smuggling offense is evidenced by his statements to Gonzalez. Fernandez noted that the boat used during this venture was intercepted by the Coast Guard, and a child on board was dehydrated. He then stated "[w]e lost that

15

trip." Fernandez's use of the word "we," as well as his knowledge of the circumstances surrounding the November-December 2007 smuggling operation indicate that he was involved in the operation. There is also evidence that Fernandez took a substantial step in furtherance of the November-December 2007 operation. Bello testified that Fernandez put him in contact with Chino after Bello told Fernandez about his plans to smuggle individuals from Cuba. Bello also stated that Fernandez drove him to Chino's house to meet with Chino the day before Bello traveled to Cuba. He stated that Fernandez was present during Chino and Bello's discussions and, later, Fernandez asked Bello if he "knew what he was doing." The next morning, Fernandez accompanied Chino and Bello to the boat ramp to launch the boat that Bello drove to Cuba. Brown testified that an empty boat trailer "consistent with the boat trailer that the Fins normally is on or was on" was parked at Fernandez's residence on December 1, 2007. This evidence, viewed in the light most favorable to the government, was sufficient for jurors to infer that Fernandez attempted to smuggle aliens into the United States in late November and early December 2007. See Williams, 527 F.3d at 1244.

There was also sufficient evidence to support Fernandez's conviction for aiding and abetting. First, the substantive offense was committed by someone, because the evidence showed that Sergio brought Libertad's children into the

16

United States. Secondly, Fernandez committed an act that contributed to and furthered the offense. According to Gonzalez, Fernandez assisted Sergio by showing him the route that he had to take, taking a vessel out to Sergio, and meeting the refueler. Fernandez also introduced Libertad to Chino for the purpose of arranging their illegal entry into the United States. With respect to the November-December 2007 smuggling venture, Bello testified that Fernandez put him in contact with Chino when Bello mentioned that he was planning a smuggling operation, and that Fernandez accompanied Chino and Bello to launch the vessel that Bello drove to Cuba. Finally, the fact that Fernandez expected to be paid for his assistance indicates that he intended to aid in the commission of the offense.

*Evidentiary Issues*

We review a district court's decision to admit evidence for an abuse of discretion. United States v. Cole, 755 F.2d 748, 766 (11th Cir. 1985). "An erroneous evidentiary ruling will result in reversal only if the resulting error was not harmless." Untied States v. Hands, 184 F.3d 1322, 1329 (11th Cir. 1999). "An error is harmless unless there is a reasonable likelihood that [it] affected the defendant's substantial rights." Id. (internal quotations omitted).

*A.*     *Photo Pack Line-Up (GEs 26-28)*

To determine whether an out-of-court identification was properly admitted,

17

we first ask "whether the original identification procedure was unduly suggestive." United States v. Brown, 441 F.3d 1330, 1350 (11th Cir. 2006).  If the procedure was unduly suggestive, we next consider "whether, under the totality of the circumstances, 'the identification was nonetheless reliable.'"  Id.  If a defendant fails to argue or present evidence suggesting that identification techniques were "unduly suggestive," a district court does not abuse its discretion in admitting the identification evidence without further inquiry.  Id.

As an initial matter, although the government argues that Fernandez's confrontation clause argument should be reviewed for plain error, Fernandez, in objecting to the admission of the photo pack line-up in the district court, argued that "the agent that actually showed these items to [Cordero] . . . needs to be able to testify," regarding how the photo line-up was created and how Cordero made the identifications.  Thus, it appears that Fernandez preserved his confrontation clause argument.  However, even under an abuse-of-discretion standard, Fernandez's argument must fail.  Because Fernandez never argued, in either the district court or on appeal, that the identification techniques employed were "unduly suggestive," the district court did not abuse its discretion in admitting the identification evidence without requiring an agent to testify about the identification process.  See Brown, 441 F.3d at 1350.

18

*B.*     *Government's Objection to a Question Regarding Bello's Character*

Evidence of prior bad acts "is not admissible to prove the character of a person in order to show action in conformity therewith." Fed.R.Evid. 404(b). "The rule is one of inclusion which allows [prior bad acts] evidence unless it tends to prove only criminal propensity." United States v. Cohen, 888 F.2d 770, 776 (11th Cir. 1989). Evidence of prior bad acts is subject to a three-part test: "(1) the evidence must be relevant to an issue other than the defendant's character; (2) the probative value must not be substantially outweighed by its undue prejudice; and (3) the government must offer sufficient proof so that the jury could find the defendant committed the act." United States v. Ellisor, 522 F.3d 1255, 1267 (11th Cir. 2008).

In the district court, defense counsel stated that the purpose of Bello's testimony regarding Rodriguez's age at the time she gave birth to his son was "to show that [Bello] was engaged in criminal activity when he first came [to the United States.]" Thus, it appears that defense counsel's intent was to use Bello's testimony "to prove only criminal propensity." See Cohen, 888 F.2d at 776. Although Fernandez argues on appeal that Bello's testimony was relevant to the truthfulness of his testimony, it is not clear how Bello's relationship with an underage woman would have any bearing on his propensity for truthfulness.

Finally, although the court sustained the government's objection to the questioning, it refused to strike Bello's testimony that he was 28 years old and Rodriguez was 15 or 16 at the time she gave birth to his child. Later, Perez testified that Bello and Rodriguez began their relationship when Rodriguez was 14 years old, and Rodriguez testified that she was 17 years old and had a son that was 1 year and 10 months' old. Accordingly, even if the district court had erred in excluding the testimony, the error would have been harmless, because Bello's testimony would have been cumulative in light of Perez's and Rodriguez's subsequent testimony. See Hands, 184 F.3d at 1329 (providing that "an erroneous evidentiary ruling will result in reversal only if the resulting error was not harmless").

### C. Buckner's Testimony

A knowing and affirmative withdrawal of a previously articulated objection constitutes a waiver that precludes appellate review of the alleged error, and the plain error doctrine is inapplicable. See United States v. Horsfall, 552 F.3d 1275, 1283-84 (11th Cir. 2008), cert. denied, 129 S.Ct. 2034 (2009).

The district court initially admitted Buckner's testimony "subject to some evidence presented later" that would connect to Fernandez the address and phone number Buckner had recorded. Subsequently, Brown testified that the phone

number (239) 810-6152 was registered to Perez. At this point, defense counsel agreed that the court could "admit [Buckner's testimony] now subject to some evidence presented later." The court asked for "[a]ny argument as to the admissibility of [Buckner's] testimony in light of the evidence we've received to date," and defense counsel responded "[n]ot at this time." Defense counsel never again addressed the admissibility of Buckner's testimony during the course of trial. Accordingly, Fernandez has waived and cannot now assert any argument that the district court erred in admitting Buckner's testimony. See Horsfall, 522 F.3d at 1283-84. Furthermore, even if Fernandez's claim was not waived, any error would be harmless, because other testimony, presented by Brown, established that Fernandez resided at 2231 Northwest 7th Place, and that the phone number listed in Buckner's report was registered to Fernandez's wife.

### D.    Libertad's Testimony

We review determinations of the admissibility of evidence for abuse of discretion. United States v. Miles, 290 F.3d 1341, 1351 (11th Cir. 2002) (reviewing the admissibility at trial of hearsay evidence under Fed.R.Evid. 810(d)(2)(E)). Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c).

21

The specific testimony to which Fernandez objected at trial was Libertad's statement that the agreement reached from the meeting at the restaurant was that Gonzalez and Fernandez would organize another smuggling trip to Cuba to pay off the $20,000 debt Libertad owed to Chino. This testimony does not constitute hearsay, because Libertad did not testify about any specific statement that Gonzalez or Fernandez made during the meeting. Instead, she testified regarding the context, that is, the understanding that resulted from a meeting in which she participated. Accordingly, the district court did not abuse its discretion in admitting Libertad's testimony.

### E.      *Transcripts of Meetings Between Fernandez and Gonzalez*

Transcripts may be provided to a jury to assist it in evaluating recorded conversations, provided that the transcripts are accurate. United States v. Rochan, 563 F.2d 1246, 1251 (5th Cir. 1977). While the individual who typed a transcript may lay the foundation for its use, "the issue in the authentication of supplemental transcripts is not who made them; the issue is whether they are accurate." Id. "In this respect, a supplemental transcript is like a photograph that supplements the testimony of a live witness. . . . [T]he witness who lays the foundation need not be the photographer nor need he know anything of the time, conditions, or mechanisms of the taking; he need only be familiar with the object the photograph

22

represents." Id. (internal quotations omitted).

When a transcript contains a translation of conversations spoken in a foreign language, a qualified witness must authenticate and verify the translation. See United States v. Llinas, 603 F.2d 506, 509-10 (5th Cir. 1979). A party who wishes to challenge the accuracy of a translation bears the burden of presenting another translation so that the jury may choose which version to believe. United States v. Rosenthal, 793 F.2d 1214, 1238 (11th Cir. 1986) (citing Llinas, 603 F.2d at 509).

As an initial matter, Fernandez objects to the introduction of the transcripts of the recorded conversations, not to the introduction of the CDs. Accordingly, the relevant inquiry is the accuracy of the transcripts. Rochan, 563 F.2d at 1251. Conde identified GEs31-A, 32-A, 33-A, 34, 35, and 36 as the audio CDs that she translated and GEs 31-B, 32-B, 33-B, 34-A, 35-A, and 36-A as accurate transcripts of the conversations contained on the CDs. She stated that she reviewed the CDs in conjunction with the transcripts and made corrections to the transcripts where necessary. Because Conde testified that the transcripts were accurate and Fernandez fails to allege that any specific sections of the transcripts are inaccurate, the district court did not err in admitting the transcripts. See Rochan, 563 F.3d at 1251; Rosenthal, 793 F.2d at 1238; Llinas, 603 F.2d at 509-10.

*F.     GEs 21 and 23*

23

We review a district court's rulings on the relevance of evidence for abuse of discretion. United States v. Todd, 108 F.3d 1329, 1332 (11th Cir. 1997). The Federal Rules of Evidence provide that only relevant evidence is admissible. Fed.R.Evid. 402. "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. When proffered evidence is "of substantial probative value, and will not tend to prejudice or confuse, all doubt should be resolved in favor of admissibility." Todd, 108 F.3d at 1332.

The district court did not abuse its discretion in admitting GE 21 because the exhibit was relevant to Fernandez's connection to the conspiracy. The exhibit, which was two pieces of paper found in the home of one of Fernandez's co-conspirators, showed that a number of individuals, including Libertad's children, had not yet paid. This corroborates Fernandez's statement to Gonzalez that only 18 out of the 23 Cuban migrants that were brought into the country during the April 2008 trip had paid. Thus, the paper shows that Fernandez had knowledge of the specific details of the April 2008 trip and supports the argument that he was involved in the conspiracy. The court also did not abuse its discretion in admitting GE 23, because the receipt evidenced the purchase of minutes for a

satellite phone used in the smuggling offense. Accordingly, the district court did not abuse its discretion in admitting GEs 21 and 23.

*Cumulative Error*

"The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005) (quotation marks omitted). Where there is no error or only a single error, there can be no cumulative error. United States v. Waldon, 363 F.3d 1103, 1110 (11th Cir. 2004).

As discussed above, the evidentiary rulings challenged by Fernandez were not erroneous. Because the district court committed no errors in ruling on Fernandez's objections, Fernandez's cumulative error argument must also fail. See Waldon, 363 F.3d at 1110.

*U.S.S.G. § 2L1.1(b)(6) Enhancement*

With respect to sentencing guideline issues, we review legal questions de novo and factual findings for clear error. United States v. Rodriguez-Lopez, 363 F.3d 1134, 1136-37 (11th Cir. 2004).

Section 2L1.1(b)(6) provides that if an alien smuggling, transporting, or harboring offense "involved intentionally or recklessly creating a substantial risk

25

of death or serious bodily injury to another person," the offense level is increased by two levels. U.S.S.G. § 2L1.1(b)(6). Reckless conduct under this subsection "includes a wide variety of conduct (e.g., transporting persons in the trunk or engine compartment of a motor vehicle, carrying substantially more passengers than the rated capacity of a motor vehicle or vessel, or harboring persons in a crowded, dangerous, or inhumane condition)." U.S.S.G. § 2L1.1, comment. (n.5).

The PSI stated that a 2-level enhancement, pursuant to § 2L1.1(b)(6) was appropriate, because (1) each vessel used in the smuggling operations contained more people than is safe according to www.boatingbasicsonline.com, and (2) there were a total of 22 individuals, including 2 children, but only 10 life vests on board the Fins vessel during the December 1, 2007 smuggling venture. At the sentencing hearing, Fernandez objected to the application of the enhancement, but he did not object to the accuracy of the facts on which the court based the enhancement. Because Fernandez failed to object to the facts set forth in the PSI, we accept those facts as true and determine whether the § 2L1.1(b)(6) enhancement is warranted where the vessels involved in the smuggling operations contained more people than is safe, and there were only 10 life vests on board a vessel carrying 22 individuals from Cuba to Florida. See United States v. Shelton, 400 F.3d 1325, 1330 (11th Cir. 2005) (holding that where a defendant fails to object to factual

26

statements in the PSI, the facts are deemed admitted as true).

Fernandez argues that he did not intend to create a substantial risk of death or serious bodily injury to another person, but such intent is not required to trigger the enhancement; instead, it is sufficient if the defendant recklessly created such a risk. See U.S.S.G. § 2L1.1(b)(6). The commentary to § 2L1.1(b)(6) specifically lists "carrying substantially more passengers than the rated capacity of a . . . vessel" as reckless conduct that would justify imposition of the enhancement. U.S.S.G. § 2L1.1, comment. (n.5). In this case, the vessels not only carried more passengers than was safe, but one vessel carried enough life vests for less than half of the passengers on board. Under these circumstances, the district court did not err in imposing the two-level enhancement.

### *U.S.S.G. § 3C1.1 Enhancement*

When the district court imposes an enhancement for obstruction of justice, we review the district court's factual findings for clear error and its application of the Sentencing Guidelines to those facts de novo. United States v. Massey, 443 F.3d 814, 818 (11th Cir. 2006).

Section 3C1.1 permits a two-level enhancement for obstruction of justice if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or

sentencing of the instant offense of conviction" and "the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense." U.S.S.G. § 3C1.1. We have explained that:

> The district court must make an independent factual finding that the defendant gave perjured testimony on a material matter in order to apply the enhancement. It is preferable that the district court make specific findings as to each instance of obstruction by identifying the materially false statements individually. It is sufficient, however, that the district court makes a general finding of obstruction of justice that encompasses all of the factual predicates of perjury.

United States v. Vallejo, 297 F.3d 1154, 1168 (11th Cir. 2002) (internal quotations and citations omitted). Statements are "material" when, "if believed, [they] would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1, comment. (n.6). The commentary to § 3C1.1 explains that "[t]his provision is not intended to punish a defendant for the exercise of a constitutional right." U.S.S.G. § 3C1.1, comment. (n.2). Where a defendant denies his guilt under oath in a manner that constitutes perjury, however, the enhancement is appropriate. Id. The Supreme Court has held that a defendant commits perjury where he "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. Dunnigan, 507 U.S. 87, 94, 113 S.Ct. 1111, 1116, 122 L.Ed.2d 445 (1993).

28

As an initial matter, Fernandez argues that the district court should not have imposed this enhancement, because the jury did not determine whether his statements hindered the prosecution. This argument is without merit, because a district court may make extra-verdict factual findings at sentencing, using a preponderance of the evidence standard, provided that the court treats the resulting guideline range as advisory. United States v. Chau, 426 F.3d 1318, 1323 (11th Cir. 2005).

In determining that the § 3C1.1 enhancement applied, the district court made an independent factual finding that Fernandez gave perjured testimony on three material matters. See Vallejo, 297 F.3d at 1168. The court found that the enhancement was warranted by Fernandez's testimony that (1) he did not know that Chino was involved in Cuban smuggling, (2) he did not have anything do with the alien smuggling trip, and (3) he denied going with Bello and Chino to launch Chino's speedboat. Fernandez's testimony that he did not have anything to do with the December 2007 alien smuggling trip, standing alone, justifies the enhancement, because it constitutes a denial of guilt under oath. See U.S.S.G. § 3C1.1, comment. (n.2). The district court also did not clearly err in determining that Fernandez's testimony, that he did not know that Chino was involved in Cuban smuggling, constituted perjury. Libertad's testimony and Fernandez's own

29

statements in several recorded conversations show that Fernandez knew that Libertad owed Chino money for his role in illegally bringing her children from Cuba to the United States. Finally, Fernandez's testimony that he did not go with Bello and Chino to launch Chino's speedboat, is contradicted by Bello's testimony that Fernandez was, in fact, present for the launching of the speedboat.

The district court also correctly determined that all three of these statements were material. Fernandez's statement that he did not know that Chino was involved in Cuban smuggling is material, because, to prove a conspiracy, it was necessary to show that Fernandez had an agreement with Chino to bring Libertad's children to the United States. Fernandez's statement that he was not involved in smuggling was material, because, if the jury would have believed this statement it would have found Fernandez not guilty. Finally, Fernandez's statement that he did not go with Bello and Chino to launch Chino's speedboat was material, because the fact that Fernandez did accompany Bello and Chino shows that he aided and abetted the smuggling activity. The fact that the jury did not believe Fernandez's testimony is irrelevant to the issue of materiality, because the guideline commentary clearly states that statements are material when "if believed, they would tend to influence or affect the issue under determination." See U.S.S.G. § 3C1.1, comment. (n.6) (emphasis added). Accordingly, the district court did not

30

err in applying the § 3C1.1 enhancement.

*Reasonableness of the Sentence*

We review a sentence imposed by the district court for reasonableness, under an abuse-of-discretion standard. United States v. Bonilla, 579 F.3d 1233, 1239 (11th Cir. 2009). A sentence may be procedurally unreasonable if the sentencing court fails to accurately calculate the guideline range, treats the guidelines as mandatory, fails to consider the factors set forth in 18 U.S.C. § 3553(a), or fails to adequately explain the chosen sentence. Gall v. United States, 552 U.S. 38, __, 128 S.Ct. 586, 597, 169 L.Ed.2d 445 (2007). The § 3553(a) factors a district court must consider include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims.

United States v. Talley, 431 F.3d 784, 786 (11th Cir. 2005) (citing 18 U.S.C. § 3553(a)). The district court need not discuss or state on the record each § 3553(a) factor explicitly. United States v. Scott, 426 F.3d 1324, 1329 (11th Cir.

2005). Instead, an acknowledgment by the district court that it has considered the defendant's arguments and the § 3553(a) factors will suffice. Id. at 1329-30. The sentencing court "shall impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing. See 18 U.S.C. § 3553(a). A sentence is substantively unreasonable if the district court made a clear error in judgment in weighing the § 3553(a) sentencing factors. United States v. Pugh, 515 F.3d 1179, 1191 (11th Cir. 2008). "[W]hen the district court imposes a sentence within the advisory Guidelines range, we ordinarily will expect that choice to be a reasonable one." Talley, 431 F.3d at 788.

Fernandez's sentence was not procedurally unreasonable, because the district court accurately calculated the guideline range, considered Fernandez's arguments, stated that it had considered the § 3553(a) factors, and adequately explained the chosen sentence. Fernandez's sentence was also substantively reasonable. First, his sentence was at the low end of the applicable guideline range. Second, as the government pointed out, Fernandez's guideline range was higher than Chino's because of Fernandez's criminal history and because Fernandez did not receive credit for acceptance of responsibility. Finally, as the court noted, Fernandez was an active participant in two separate alien smuggling operations. Accordingly, we affirm Fernandez's 63-month sentences.

32

**AFFIRMED.**