**Affirmed and Memorandum Opinion filed January 31, 2013.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-11-00995-CR

---

**RUBEN GUERRERO GONZALEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 176th District Court
Harris County, Texas
Trial Court Cause No. 1269771**

---

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant, Ruben Guerrero Gonzalez, of aggravated assault of a family member and assessed punishment at twenty years' incarceration in the Texas Department of Criminal Justice, Institutional Division. In five issues, appellant appeals his conviction and sentence. We affirm.

# I. Background

## A. Guilt-Innocence

The following evidence was presented at the guilt-innocence phase of trial. Anna Vasquez, the complainant, had been married to appellant for sixteen years until their divorce in 2007. Anna and appellant had four children. Anna was planning a "quinceanera"—a fifteenth birthday party—for their daughter, Isabel. On June 19, 2010, appellant called Anna and told her to come to his house because he was going to give her money for Isabel's party. Appellant was not there when Anna arrived, but he arrived about ten minutes later. Appellant asked Anna to go to the bank with him. Appellant asked Anna to ride in his car, but she had "doubts" and was afraid and chose to drive separately in her car.

On the way to the bank, appellant pulled into the driveway of a construction site. Anna parked next to appellant, and got out of her car. Appellant said he wanted to talk to Anna and asked her to sit in his car. Anna responded that she could hear him from outside the car. Appellant told Anna that he wanted her to come back to him, but Anna said she would not. Appellant became furious, and his face changed: "He looked as though evil had just confronted him." Anna walked quickly back to her car and got in. When she started to put the car in reverse, she saw that appellant was sitting in the passenger seat.

Appellant said to Anna, "You dog, with how many have you cheated on me." Appellant raised his t-shirt and pulled out a black object, which Anna later realized was a gun. Appellant put the gun against her right side and began to shoot. Anna tried to block the bullets with her arm. Appellant said, "They say the ones that are going to die, they tell the truth. . . . Tell me, with how many you have cheated on me, bitch." Anna asked appellant to take her to the hospital. She believed that she was going to die, and she was afraid her family would not know

2

where her body was.  Appellant agreed to take her to the hospital if she did not say anything and if she promised to go back to him.  Appellant laid Anna on the backseat, but she felt like she was choking.  She asked appellant to sit her up, and she hugged the seat.  Appellant threw the gun away in a trash can at the hospital before they pulled into the driveway and she was taken out of the car.

Appellant went inside and informed hospital personnel that he had seen Anna on the side of road and drove her to the hospital.  Appellant identified himself as Pedro Guerrero.  When asked by hospital personnel and the police, appellant said that he did not know Anna, nor did he mention that Anna was his former wife.  When Officer Woodrow Tomkins asked Anna, who was in and out of consciousness, if she knew who had shot her, she "kind of muttered no no, like she was afraid of me or something."

At this point the police treated appellant as a witness.  Officer Gabriel Olvera took appellant back to where appellant had left his car.  Olvera looked for evidence, but did not find any.  Olvera followed appellant back to his house and then drove appellant to the police station to give a witness statement.[1]  Olvera

---

[1] In his statement to the police, appellant stated that his name was Ruben Guerrero Gonzalez and explained the following:

> About 1:30 p.m. this afternoon I was driving to Sellers Brothers Grocery Store when I saw this white car sitting on the side of the road in a driveway with a closed gate.  I saw that the trunk of the car was wide open.  I pulled over next to the car to see if someone needed help.  I saw the girl sitting in the drivers [sic] side of the car bleeding from the side of the body and [she] told me to help her.

> I asked her what happened and she repeatedly told me to help her.  I opened her car door, took her out of the drivers's [sic] side and put her in the back seat.  I then got back into the driver [sic] side and drove her to Humble Hermann Memorial Emergency Room taking, [sic] Little York Road to E. Hardy going north to the Beltway 8 East and then to Highway 59 North.

> Once I got to the hospital, I asked for help from the people at the emergency room.  I then got her out of the car and placed her on the wheel chair for the people to help her.  I then waited there at the emergency room because the

3

found it odd that appellant did not take Anna to a closer hospital.  Appellant said it was the only hospital he knew, and he did not call 911 because he thought it would be quicker to drive Anna to the hospital.  Appellant referred to Anna in his statement as "the girl," and he did not tell Olvera that Anna was his former wife.

Anna was transferred by helicopter to another hospital in the medical center.  Anna's family did not find out that she had been shot and was in the hospital until the following day, June 20, when a social worker called Anna's sister, Blanca Vasquez.  Anna's daughter, Isabel, learned of Anna's condition when the daughter of one of Anna's other sisters called Isabel.  Anna's children came to the hospital with appellant on June 20.  Appellant told Blanca he just found out that Anna had been shot.  He did not tell Blanca that he had taken Anna to the hospital the day before.

Anna's sisters and appellant took turns staying with Anna at night because they did not know who had shot her.  Appellant stayed with Anna three nights; Isabel was with appellant one of those times.  Blanca thought it was unusual for appellant to help out at the hospital because he and Anna had been divorced for a long time and he was known for "being a person that is not willing to help."  Anna was not able to speak for about two weeks.

The police did not develop a suspect until July 7, 2010, when Officer Lewis Hernandez interviewed Anna's brother, Jorge Rodriguez, her sister, Blanca Vasquez, and her son, Victor Gonzalez.  These witnesses told Hernandez appellant's name, which Hernandez recognized from a report as the person who had dropped Anna off at the hospital.  Hernandez put together a photospread, from

_____

people told me to wait.

I left my car with the keys in the ignition at the place where I saw the girl in her car.

4

which Anna identified appellant. Hernandez and Sergeant J.C. Bonaby then interviewed Anna and took a recorded statement.

Bonaby and Hernandez obtained an arrest warrant for appellant, and found appellant in the waiting room at the hospital. Appellant consented to the search of his residence and vehicle. During a search of appellant's residence, the police recovered a box of .32 caliber Smith and Wesson bullets underneath a mattress. There were bullets missing from the box.

From Anna's car, the police recovered two fired bullets with blood on them from the driver's seat and between the driver's seat and the center console. The fired bullets were .32 caliber. One of the fired bullets, State's Exhibit 7, was consistent with the bullets from the box in terms of size, weight, and style. A portion of the other fired bullet, State's Exhibit 8, was missing. However, the firearms examiner did not know if the fired bullets came from the box.

There was blood on the steering wheel, the center console, the driver's seat, and the back seat. The police also recovered Anna's purse from the floor on the passenger's side of the car. The purse contained documents, a cell phone, and $765.63 in cash. Bonaby testified that this case did not involve a robbery because Anna's purse was found in the car with the cash still in it. In Bonaby's opinion, the person who shot Anna was inside the vehicle because Anna was mostly shot on the right side, indicating that the bullets came from the passenger side. Having interviewed Anna, his opinion that she was shot in the vehicle is consistent with her story.

Anna was shot six times—the common number of rounds in a revolver. She had four surgeries and spent nearly two months in the hospital, getting out on August 13, 2010. The jury found appellant guilty of aggravated assault of a family member.

5

## B. Punishment

The following evidence was presented at the punishment phase of trial. Regarding a previous conviction, on June 7, 1999, appellant was convicted on his guilty plea for assaulting Anna. According to Anna, appellant came home from work and started drinking. The children were asking for food, and there was nothing in the refrigerator. Anna told appellant, but she eventually borrowed some money from a neighbor and went to the store. When Anna later chastised appellant, he became "very angry, and started beating [her]." Isabel called 911, and the police came.

Regarding the current conviction, Anna's four surgeries included the reconstruction of her pancreas, liver, and intestines. At the time of trial, Anna still needed more surgery on her intestines. Anna was not able to communicate for two weeks after the shooting. During that time, appellant would see her. He threatened Anna, gave her water even though her doctor said could not have any, applied pressure to the intravenous needles causing pain, and caused morphine to be administered to her when she had not asked him to do so.

Appellant presented the testimony of two brothers and a sister-in-law regarding his good character. Appellant's sister-in-law testified that appellant helped her take his brother to the doctor. Appellant's brothers testified that appellant had not been convicted of a felony in Texas or any other state. Appellant's younger brother believed that appellant would successfully complete the terms of probation if appellant received probation, and appellant would not be a danger to society or Anna. However, none of appellant's witnesses was aware that he had been convicted of assault in 1999.

A community supervision officer testified that in a case involving domestic violence, the defendant is required to participate in a domestic violence program

6

and cannot have any contact with the victim. The officer could not say how effective the domestic violence program is or that the probation department could guarantee that appellant would not attack Anna again. The jury assessed appellant's punishment at twenty years' confinement.

## II. ANALYSIS

### A. Motion for New Trial

In his first issue, appellant contends that the trial court abused its discretion by failing to hold a hearing on his motion for a new trial. The State urges that this issue should be overruled because appellant's affidavit in support of the motion for new trial was untimely and conclusory.

"A defendant may file a motion for new trial before, but no later than 30 days after, the date when the trial court imposes or suspends sentence in open court." TEX. R. APP. 21.4(a). "Within 30 days after the date when the trial court imposes or suspends sentence in open court but before the court overrules any preceding motion for new trial, a defendant may, without leave of court, file one or more amended motions for new trial." *Id.* 21.4(b). Filing an affidavit in support of a motion for new trial more than thirty days after sentencing is considered an untimely attempt to amend the motion. *Klapesky v. State*, 256 S.W.3d 442, 455 (Tex. App.—Austin 2008, pet. ref'd) (citing *Dugard v. State*, 688 S.W.2d 524, 529–30 (Tex. Crim. App. 1985), *overruled on other grounds by Williams v. State*, 789 S.W.2d 802, 803 (Tex. Crim. App. 1989) (op. on reh'g)); *Flores v. State*, 18 S.W.3d 796, 798 (Tex. App.—Austin 2000, no pet.). The motion for new trial must not only be filed timely, but also it must be "presented" to the trial court within ten days of its filing. TEX. R. APP. P. 21.6.

On November 2, 2011, the trial court signed the judgment. On November

30, 2011, appellant filed a motion for new trial, alleging that (1) his punishment is unjust and inappropriate; (2) the verdict is contrary to the law; and (3) he received ineffective assistance of counsel. No affidavit accompanied the motion for new trial. However, on December 5, 2011, appellant filed an "Affidavit in Support of Motion for New Trial with Briefing." On December 7, 2011, the trial court signed the order denying appellant's motion for new trial. The order includes the handwritten notation, "Presented 7 Dec 2011," and it is signed by the trial court.

While appellant timely filed his motion for new trial on November 30, 2011, he did not file his affidavit until thirty-three days after the trial court had signed the judgment. This was an untimely attempt to amend the motion for new trial. *See Klapesky*, 256 S.W.3d at 455; *Flores*, 18 S.W.3d at 798. The motion for new trial was presented timely on December 7, 2011, within ten days after appellant filed the motion. We have no reporter's record of any proceeding that took place on December 7, 2011, and there is no written objection by the State to the late-filed affidavit. The record does not reflect whether the trial court considered appellant's untimely affidavit when it denied appellant's motion for new trial.

We need not determine whether the trial court considered the untimely affidavit. Even if the trial court considered the affidavit, we conclude that the affidavit was not sufficient and the trial court did not abuse its discretion by denying the motion for new trial without a hearing.

The right to a hearing on a motion for new trial is not absolute. *Reyes v. State*, 849 S.W.2d 812, 815 (Tex. Crim. App. 1993). As a prerequisite to obtaining a hearing, the motion must be verified or supported by an affidavit by the accused or someone else specifically showing the truth of the grounds of attack. *Jordan v. State*, 883 S.W.2d 664, 665 (Tex. Crim. App. 1994). A defendant is entitled to a hearing on a motion for new trial if the motion and the supporting affidavits raise

8

matters not determinable from the record that could entitle him to relief. *Wallace v. State*, 106 S.W.3d 103, 108 (Tex. Crim. App. 2003). The affidavit is not required to reflect every component legally required to establish relief but the motion for new trial or affidavit must reflect that reasonable grounds exist for holding that such relief could be granted. *Jordan*, 883 S.W.2d at 665; *Reyes*, 849 S.W.2d at 816. Affidavits which are conclusory in nature and unsupported by facts are not sufficient to put the trial court on notice that reasonable grounds for relief exist. *Jordan*, 883 S.W.2d at 665. If the defendant's motion and affidavit are sufficient, a hearing on the motion is mandatory. *Id.* We review the trial court's denial of a hearing for an abuse of discretion. *Smith v. State*, 286 S.W.3d 333, 338 (Tex. Crim. App. 2009).

Unlike the other issues raised by appellant's motion for new trial, whether appellant receive ineffective assistance of counsel during trial is not determinable from the record; therefore, we must determine whether appellant's affidavit provides reasonable grounds which would entitle him to a hearing on his motion for new trial. *See Buerger v. State*, 60 S.W.3d 358, 362 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd); *see also Smith*, 286 S.W.3d at 341 ("Because the appellant's [ineffective assistance] claim is not determinable from the record, we must decide whether his motion and affidavit show reasonable grounds that could entitled him to relief."). "To do so, the appellant must allege facts that would reasonably show that his counsel's representation fell below the standard of professional norms and that there is a reasonable probability that, but for his counsel's conduct, the result of the proceeding would have been different." *Smith*, 286 S.W.3d at 341.

In his affidavit, appellant states:

My trial attorney did not represent me capably. I gave him several

9

specific witnesses at both guilt and innocence and at punishment and he did not speak with them or call them at trial. I believe that my case was not handled correctly. My lawyer did not investigate the defenses that I provided him nor conduct any independent investigation of my case. At punishment there were a number of favorable witnesses that could have been called[—]he did not subpoena or obtain any of my school records or work history or good behavior while in jail or present any good character evidence from friends or family. I received the maximum sentence possible and I believe this was due to Mr. Rodriguez's failure to represent me properly.

Appellant's affidavit is conclusory, and his motion for new trial contains only bare assertions of his trial counsel's alleged deficiencies.

Appellant has not explained what the uncalled witnesses would have testified to or that they would have been available to testify at all. Moreover, appellant has not specifically stated what investigation his trial counsel failed to conduct or what defenses he provided to trial counsel that trial counsel failed to investigate. *See King v. State*, 29 S.W.3d 556, 569 (Tex. Crim. App. 2000) (holding that the appellant's bare assertions, including those of ineffective assistance of counsel, did not entitle him to a hearing on his motion for new trial; the appellant did not allege what further investigation counsel should have conducted, who his alibi witness was, or how an alibi defense could have been persuasive); *Jordan*, 883 S.W.2d at 665 (holding that the appellant's affidavit was conclusory in nature because he failed to say why counsel's investigation was deficient, or what any further investigation would have revealed; therefore, the motion for new trial was not sufficient to put the trial court on notice that reasonable grounds existed to believe that counsel's representation was ineffective); *Klapesky*, 256 S.W.3d at 455 (holding that the appellant's affidavit, which was conclusory, and the motion, which made only bare assertions that counsel failed to present easily obtainable evidence of his innocence and call witnesses who would have substantiated his affirmative defense, were insufficient

10

to put the trial court on notice that reasonable grounds existed for relief).

We hold that appellant's motion for new trial and affidavit are not sufficient to put the trial court on notice that reasonable grounds exist for relief to be granted.[2] Therefore, because appellant's affidavit was deficient, the trial court did not abuse its discretion in failing to hold a hearing on appellant's motion for new trial. We overrule appellant's first issue.

## B. Motion for Mistrial

In his second issue, appellant complains that the trial court erred in denying his motion for a mistrial because there was no instruction that could have cured Anna's emotional plea to the jury. After Anna finished testifying and as she was leaving the witness stand, she held her hands in a praying position and said, "please," to the jury. Appellant's counsel saw Anna's plea to the jury and informed the trial judge and the prosecutor, neither of whom saw Anna's action. The following exchange took place at the bench out of the hearing of the jury:

> MR. RODRIGUEZ [APPELLANT'S COUNSEL]: I didn't want to say this in front of the jury so they could hear, but for the record, when the witness walked in front of the jury, she held her hands in a praying motion, like pleaing [sic] to them as she looked at them, and said please before she walked out of the courtroom. Because of that, I would ask for a mistrial or that the State instruct its witnesses not to communicate with the jury in that manner.
>
> MR. MOSS [THE PROSECUTOR]: When did this happen?
>
> MR. RODRIGUEZ: When she was walking from the witness stand to the door.
>
> MR. MOSS: I wouldn't —
>
> THE COURT: I wasn't paying any attention.

---

[2] Furthermore, the record does not support appellant's assertion that trial counsel was ineffective for failing to present "good character evidence from family friends." Three family members testified as to appellant's "good character."

MR. MOSS: I didn't see that. I will talk to them. I don't have anymore [sic] civilian witnesses.

With the jury out of the courtroom, the trial court then questioned Anna and determined that she, in fact, had communicated to the jury:

THE COURT: . . . Ms. Vaquez, when you got down from the witness stand and walked to the back door, did you put your hands together in a praying motion and look to the jury and say please?

MS. VASQUEZ: Correct.

THE COURT: And what was the purpose of that?

MS. VASQUEZ: Praying that they would answer my prayer.

THE COURT: And who told you that you could speak to the jury directly when you're not on the witness stand?

MS. VASQUEZ: Excuse me, I didn't know that.

THE COURT: So do you really speak English?

MS. VASQUEZ: Just simple words.

The following discussion took place among the trial court, appellant's counsel, and the prosecutor concerning the remedy for Anna's action:

THE COURT: Okay. I realize we're dealing with rather unsophisticated people here, so as far as I see it, my options are this, I can individually question the jury about what they saw and whether or not that's going to affect their verdict, or I can bring them out and admonish them as a group to completely disregard that little demonstration, or I could instruct them to disregard the demonstration and then question them either as a group or individually whether or not that's going to affect their verdict. What's your druthers?

MR. MOSS: The State would just ask for an admonishment.

MR. RODRIGUEZ: The Defense, your Honor, would ask for an admonishment not to allow anything — or to disregard any outside actions other than direct testimony, and then ask generally if anybody was affected by any outside action. That's what [the] Defense would ask for.

THE COURT: I'll be happy to do that, since they have been repeatedly admonished not to let anything.

12

And are you saying there are no more civilian witnesses?

MR. MOSS:  I have only two experts left, your Honor.

THE COURT:  I assume your experts will not pray to the jury for a verdict.

All right.  Let's have the jury back out.

The jury returned to the courtroom, and the trial court admonished the jurors not to consider Anna's plea and asked whether they could disregard Anna's plea:

THE COURT: . . . All right.  Ladies and gentlemen, it was brought to my attention that as the complaining witness left the witness stand, Ms. Vasquez, as she passed by the jury box, that she put her hands together in a praying motion and mouthed or said the word "please" to you all in English.

Please understand, ladies and gentlemen of the jury, we cannot have you take those actions, which were completely unauthorized, to give any consideration whatsoever for that unauthorized act.  What I need to know — you are to disregard it completely and not let it play any factor whatsoever in your deliberations in this case.  It is not evidence.  It's not sworn evidence.  It's just nothing.

Now, I need to know from you now if there is anyone that's going to let those actions by the complaining witness affect them in their deliberations.  Anybody?  Can everybody raise their hands and assure me that they can completely disregard those actions by the complaining witness?  Everybody raise your hand if you can.

(Hands raised.)

THE COURT:  Okay.  Raise your hand if you think you cannot, or if you know you cannot.

All right.  I see all twelve hands raised that they can completely disregard those actions by the complaining witness.  Very good.

Appellant's counsel then moved for a mistrial "just to protect the record," which the trial court denied.

A mistrial is a device used to halt trial proceedings when error is so prejudicial that expenditure of further time and expense would be wasteful and

futile. *Ladd v. State*, 3 S.W.3d 547, 566 (Tex. Crim. App. 1999). The trial court may properly exercise its discretion to declare a mistrial if an impartial verdict cannot be reached, or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error. *Id.*

An outburst by a witness or other bystander "'which interferes with the normal proceedings of a trial will not result in reversible error unless the defendant shows a reasonable probability that the conduct interfered with the jury's verdict.'" *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009) (quoting *Landry v. State*, 706 S.W.2d 105, 112 (Tex. Crim. App. 1985)). In the context of such outbursts, instructions to the jury are generally considered sufficient to cure improprieties that occur during trial because it is presumed that the jury will follow those instructions. *Coble v. State*, 330 S.W.3d 253, 292 (Tex. Crim. App. 2010), *cert denied*, — U.S. —, 131 S. Ct. 3030 (2011); *Gamboa*, 296 S.W.3d at 580. We review the denial of a motion for mistrial under an abuse of discretion standard. *Coble*, 330 S.W.3d at 292; *Gamboa*, 296 S.W.3d at 580. The determination of whether a given error necessitates a mistrial must be made by examining the particular facts of the case. *Ladd*, 3 S.W.3d at 566.

In *Stahl v. State*, the trial court cautioned the mother of the murder victim, before she testified, not to show emotion when being shown a morgue photograph of her son; she responded that "I can assure you I will try. . . . I can't say what's going to happen." 749 S.W.2d 826, 828 (Tex. Crim. App. 1988) (op. on reh'g). When shown the picture of her son, she stated, "Oh, my God. . . . Oh, my God. My baby. My God. . . . May he rest in hell. May he burn in hell. Oh, my baby." *Id.* The trial court instructed the jury to disregard these statements but denied the motion for mistrial. *Id.* The record revealed that the prosecutor had anticipated the mother's behavior. *Id.* at 829. The prosecutor further sought to exacerbate the

14

impact of the mother's emotional outburst on the jury by referring to the mother's conduct during closing argument. *Id.* at 830. The court noted its observation of "the prosecutor's desire to use the outburst for inflammatory purposes." *Id.*

*Stahl* is distinguishable from the facts in this case. *Stahl* was decided on the basis of prosecutorial misconduct, not merely the witness's emotional outburst. *Coble*, 330 S.W.3d at 292 (discussing *Stahl*). Here, there is no suggestion by appellant of prosecutorial misconduct. When appellant's counsel informed the trial court about Anna's direct plea to the jury, it is clear from the prosecutor's reaction that he had not seen Anna's action and that he did not know that she was going to communicate to the jury. The prosecutor did not draw further attention to Anna's conduct by referring to it during closing argument.

We find the witness's communication to the jury in *Brown v. State* similar to Anna's plea to the jury in this case. *See* 92 S.W.3d 655 (Tex. App.—Dallas 2002), *aff'd on other grounds*, 122 S.W.3d 794 (Tex. Crim. App. 2003). In *Brown*, the father of the victim in a capital murder trial, after the prosecutor had passed the witness and defense counsel had no questions, stated to the jury, "Give my son justice, please." *Id.* at 661. When the defendant started to object, the trial court stated, "Mr. Gray [the witness], unfortunately, that's out of line." *Id.* Upon the defendant's request for an instruction to disregard, the trial court announced, "The jury will disregard," but denied the defendant's motion for mistrial. *Id.* First, the *Brown* court distinguished the facts of that case from those in *Stahl*. *Id.* at 661–62. Then the court noted that the trial court's instruction to disregard was immediate, and it presumed that the jury followed the instruction to disregard. *Id.* at 662. The court held that the father's statement was neither so offensive nor so flagrant that the trial court's immediate reprimand of the witness and the instruction to the jury to disregard could not have cured the error. *Id.*

Anna's plea to the jury was no more harmful than the victim's father's plea in *Brown* or other arguably more inflammatory outbursts in other cases, which have been held not to warrant a mistrial. *See Coble*, 330 S.W.3d at 291–93 (holding capital murder defendant was not entitled to mistrial based on outbursts by two witnesses: (1) "And I hate you for making me go through this again and my kids. You're mean."; and (2) "Evil piece of shit."); *Gamboa*, 296 S.W.3d at 580 (holding that capital murder defendant was not entitled to a mistrial based on an outburst by a victim's family member shouting, "You did this for 200 dollars?", during the testimony of a prosecution witness).

Here, the trial court, which had not witnessed Anna's plea, immediately determined what had occurred and then gave a lengthy admonishment to the jury not to consider Anna's direct plea. We presume that the jury followed the trial court's instruction to disregard. *See Coble*, 330 S.W.3d at 292; *Gamboa*, 296 S.W.3d at 580. Furthermore, the trial court questioned the jurors about whether Anna's communication to them would affect their deliberations and determined that it would not.

We conclude that Anna's direct plea to the jury was not so prejudicial that it could not be cured by the trial court's thorough instructions to disregard. Therefore, the trial court's denial of appellant's motion for mistrial was not an abuse of discretion. We overrule appellant's second issue.

### C. Comment on the Failure to Testify

In his third, fourth, and fifth issues, appellant complains that it was harmful error for the prosecutor to comment on appellant's failure to testify at punishment. Appellant contends that such comment violated Article 38.08 of the Texas Code of Criminal Procedure, Article I, Section 10 of the Texas Constitution, and the Fifth

Amendment to the United States Constitution.[3]

During closing argument at punishment, the following took place:

> MR. MOSS [THE PROSECUTOR]: . . . People who are on probation, what's the first thing they always tell you, you got to accept responsibility, right? You got to accept responsibility for actions before you can ever improve yourself.

> MR. RODRIGUEZ [APPELLANT'S COUNSEL]: Your Honor, I would make an objection at this time that that's a comment on his Fifth Amendment right not to testify.

> THE COURT: That's overruled.

> MR. MOSS: When he took her to the hospital and didn't give his name, was he taking responsibility for his actions? Was he saying I did this, I'm sorry? I shot her, I lost my temper, please help her. Did he do that? No, he didn't. He took her there, denied knowing her, and tried to get away with it. Did he then accept responsibility that night? Did he take his own kids —

> MR. RODRIGUEZ: Your Honor, may I have a running objection as to accepting responsibility being a violation of his Fifth Amendment right not to testify?

> THE COURT: Well, I don't see how a running objection is going to apply to context [sic]. It's overruled, if that's your objection to what he just said about that night.

> MR. RODRIGEZ: Then I renew my objection as to accepting responsibility in violation of his Fifth Amendment right not to testify.

> THE COURT: That's overruled.

> MR. MOSS: That night when he went to the hospital, did he accept responsibility for his actions?

> MR. RODRIGUEZ: Your Honor, I object again. Unless I have

---

[3] *See* U.S. CONST. amend. V; TEX. CONST. art. I, § 10; TEX. CODE CRIM. PROC. ANN. § 38.08 (West 2005). The State argues that appellant waived his arguments under the Texas Constitution and section 38.08 of the Code of Criminal because his objections in the trial court were based solely on the Fifth Amendment to the U.S. Constitution. Even if appellant waived his state law and state constitutional arguments, we conclude as addressed below that the prosecutor did not refer to appellant's failure to testify.

a running objection I object every time he says that he doesn't accept responsibility because that's a violation of his Fifth Amendment right.

THE COURT: He's talking about that night. That's overruled.

MR. MOSS: When he didn't bring their children to the hospital, we all heard, she might die, there was a good probability, did he bring his children to the hospital that day to say good-bye to their mom? Does he do that as a hero would? No, he didn't. He didn't tell anyone they were there. In fact, not until the next day did any of her family, including her children, know she was in the hospital, in critical condition. Nobody knew that. Is that him being a hero? Is that him doing what people on probation need to do? No.

And what do we know about his family? They were very nice people, but they said that, first of all, they didn't even know he'd been convicted before. And second, they said they didn't believe he'd done it. Well, if your own family can't accept responsibility how are they going to assure he goes by it. Nobody wants to accept responsibility for what he did. He doesn't want to do it. His family members don't want to believe it.

MR. RODRIGUEZ: Your Honor, we object to the comment about Mr. Gonzalez not accepting responsibility being a violation of his Fifth Amendment right.

THE COURT: Overruled.

A comment on a defendant's failure to testify violates both the state and federal constitutional privileges against self-incrimination, as well as Texas statutory law. *Randolph v. State*, 353 S.W.3d 887, 891 (Tex. Crim. App. 2011); *Archie v. State*, 340 S.W.3d 734, 738 (Tex. Crim. App. 2011). Such a violation occurs when "the language used was manifestly intended or was of such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify." *Cruz v. State*, 225 S.W.3d 546, 548 (Tex. Crim. App. 2007). In applying this standard, the context in which the comment was made must be analyzed to determine whether the language used was of such character. *Randolph*, 353 S.W.3d at 891; *Busatmante v. State*, 48 S.W.3d 761, 765 (Tex. Crim. App. 2001). It is not sufficient that the comment might be construed

18

as an implied or indirect allusion to a defendant's failure to testify. *Busatmante*, 48 S.W.3d at 765. We view the challenged argument from the jury's standpoint and resolve any ambiguities in the language in favor of it being a permissible argument. *Randolph*, 353 S.W.3d at 891. "'We cannot find that the prosecutor manifestly intended to comment on the defendant's failure to testify, if some other explanation for his remark is equally plausible.'" *Id.* (quoting *United States v. Rochan*, 563 F.2d 1246, 1249 (5th Cir. 1977)). In a case in which the defendant does not testify, a statement that the defendant has not taken responsibility for his actions could constitute an impermissible comment on the failure to testify. *Id.* at 891–92.

Under the circumstances of this case, however, the complained-of argument does not amount to a comment on appellant's failure to testify. The prosecutor specifically asked, "Did he then accept responsibility *that night*?" and "*That night when he went to the hospital*, did he accept responsibility for his actions?"[4] The prosecutor further asked, "[D]id he bring his children to the hospital that day to say good-bye to their mom?" Here, the prosecutor was referring to the defendant's actions when he took Anna to the hospital after the shooting, not his failure to testify. Permissible jury argument includes (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to the argument of opposing counsel; or (4) plea for law enforcement. *David v. State*, 329 S.W.3d 798, 821 (Tex. Crim. App. 2010), *cert. denied*, — U.S. —, 132 S. Ct. 128 (2011). If evidence in the record supports the prosecutor's remarks, there is no error. *Randolph*, 353 S.W.3d at 892. Viewed from the jury's standpoint, the prosecutor's remarks could be construed as a summation of the evidence or a reasonable deduction from the evidence. The prosecutor's argument was clearly supported by

---

[4] Emphasis added.

evidence in the record that appellant did not admit to hospital personnel or the police that he even knew Anna, much less that they had been married, and that he did not tell Anna's family or children that she was in the hospital or that she had been shot.

The prosecutor also referred to appellant's family's refusal to accept responsibility for appellant's actions. Appellant's family did not know that appellant had been convicted of assaulting Anna in 1999. The prior assault conviction did not impact their opinions that appellant is of good character. Again, from the jury's viewpoint, the prosecutor's comments about appellant's family constituted a summation of the evidence or a deduction from the evidence, not a comment on appellant's failure to testify.

We conclude that the prosecutor's argument was not manifestly intended to or was of such a character that the jury would necessarily and naturally take it as a comment on the his failure to testify. *See id.* at 891. We overrule appellant's third, fourth, and fifth issues.

Having overruled all of appellant's issues, we affirm the trial court's judgment.

/s/    Sharon McCally
       Justice

Panel consists of Justices Boyce, McCally, and Mirabal.[5]

Do Not Publish — TEX. R. APP. P. 47.2(b).

---

[5] Senior Justice Margaret Garner Mirabal sitting by assignment.